# In the United States Court of Federal Claims

No. 17-436L
(Filed: March 20, 2020)

* * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| LEMON BAY COVE, LLC, | * |
| Plaintiff, | * |
| v. | * **Fifth Amendment Taking; Cross-motions for Summary Judgment; Regulatory Taking; Categorical Taking.** |
| THE UNITED STATES, | * |
| Defendant. | * |

* * * * * * * * * * * * * * * * * * * * * * * * * *

David Smolker, Allison Doucette, Smolker, Bartlett, Loeb, Hinds and Thompson, P.A. 100 North Tampa Street, Suite 2050, Tampa, Florida 33602, for Plaintiff.

Jean Williams, Daniel Pinkston, United States Department of Justice (CO), Natural Resources Section, 999 18th Street, South Terrace, Suite 370, Denver, Colorado 80202, Claudia Hadiigeorgiou, Jacqueline Brown, United States Department of Justice, Natural Resources Section, P.O. Box 7611, Washington, DC 20044, for Defendant.

## OPINION AND ORDER

**WILLIAMS**, Senior Judge.

Plaintiff, Lemon Bay Cove, LLC ("Lemon Bay"), the owner of mangrove wetlands in Charlotte County, Florida, claims that the Army Corps of Engineers (the "Corps") effected a taking of its property by denying Lemon Bay a permit to bulkhead and fill the property, which prevented residential development. Lemon Bay alleges a taking of both the property itself and its "vested statutory special riparian right" arising under Florida law to bulkhead and fill the property. Defendant disputes that any such "vested statutory special riparian right" exists, and argues that if it does, it would be subject to reasonable regulation. Defendant also contends that there was neither a regulatory nor a categorical taking because the property retains significant economic value.

Currently before the Court are Plaintiff's motion for partial summary judgment and Defendant's motion for summary judgment. Because there are genuine issues of material fact at this juncture of the proceedings, the Court denies the parties' cross-motions.

1

**Background**[1]

The property consists of 5.64 acres of submerged lands, high quality forested mangrove wetlands, and small upland regions on Sandpiper Key in Charlotte County, Florida. Am. Compl. ¶ 4; ECF No. 41, Ex. E at 1-2. The property includes tidal flats and open water and serves as a habitat for various birds and fish, as well as several threatened or endangered species, including the West Indian manatee and seaturtles. ECF No. 41, Ex. E at 2, 8, 30. The photograph below depicts an aerial view of the property:



ECF No. 41, Ex. E at 2.

The property is zoned "Medium Density Residential," allowing single and multi-family residential development. ECF No. 41, Ex. E at 35; Am. Comp. ¶ 14. The parties do not dispute that almost all of the property is located within the "waters of the United States," and that any discharge of fill material on the property, and thus any development, requires a permit from the Corps under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 ("RHA"), and Section 404 of the Clean Water Act, 33 U.S.C. § 1344 ("CWA"). Am. Compl. ¶ 7.

The property was originally held as sovereign land by the State of Florida. In 1917, Florida granted to the "Trustees"[2] title to certain lands in the "islands, sand bars, and shallow banks" in the tidal waters of Florida counties, and authorized the Trustees to sell such lands. 1917 Fla. Laws 116 § 1 (codified at Fla. Stat. §§ 253.12-253.17). In 1954, Mr. Earl Farr purchased the property

---

[1]   This background is derived from the exhibits to the parties' summary judgment papers, depositions, and expert opinions.
    This background should not be construed as findings of fact.

[2]   The "Trustees" were the Governor and Cabinet of the State of Florida, sitting as Trustees of the Internal Improvement Trust Fund. ECF No. 46, Ex. 8.

from the Trustees as part of a larger undeveloped lot.  ECF No. 30, Exs. A & C.  At the time of this purchase, Florida law provided:

> In case any island or submerged lands are sold by the Trustees, according to the provisions of §§ 253.12 and 253.13, the purchaser shall have the right to bulkhead and fill in same, as provided by § 309.01, without, however, being required to connect the sale with the shore or with a permanent wharf.

Fla. Stat. § 253.15 (1953).  This statute was repealed in 1957.  (Laws 1957, c. 57-362 § 10).

Mr. Farr sold the lot to Mr. John Stanford in 1955.  ECF No. 46, Ex. 3.  In 1960, Mr. Stanford had the lot platted, and was granted a permit from Charlotte County authorities to deposit spoil and dredge materials on the lot.  ECF No. 46, Exs. 5, 6.  In 1961, Mr. Stanford received permits from the Corps and the Trustees to fill the lot.  ECF No. 46, Exs. 7, 8.  As a result, by 1970, the northwest portion of the lot had been filled, but the property at issue remained undeveloped.  ECF No. 46, Ex. 9.

In 1979, Mr. Stanford sold six parcels of the lot, including the property at issue: Sandpiper Key Associates ("SKA") acquired these six parcels in 1980.  ECF No. 47, Exs. 22-24.  SKA constructed a condominium development on the northwest portion which had previously been filled by Mr. Stanford, but left undeveloped the southern areas containing the property at issue.  ECF No. 47, Ex. 25 at US_001414.  SKA failed to pay taxes on the subject property in the early 1990s, and in August 1993, Charlotte County sold the property at a tax sale to Mr. Gerald LeFave for $12,100.  ECF No. 30, Ex. D.

Mr. LeFave sought to develop the property beginning in 2007, and hired a Florida engineering firm specializing in site development preparation and surveying, DMK Associates ("DMK"), and an environmental consulting firm, Ecological Services Associates ("ESA"), to assist in acquiring permit approvals for his proposed development, "The Verandahs at Lemon Bay."  ECF No. 47, Ex. 27 at 33-35; Ex. 28 at 23-24.  This development would have required removing almost all the mangroves on the property, constructing a bulkhead, and filling a portion of the property to build 39 condominiums and a boat ramp.  ECF No. 41, Ex. C at 2; ECF No. 47 Ex. 26 at LB-ID 002864.  In initial discussions held around 2007, DMK informed Mr. LeFave that the proposed development "would not be easy to permit because of the impacts of the wetlands."  ECF No. 47, Ex. 27 at 35.[3]

In November 2007, Mr. LeFave obtained preliminary approval from Charlotte County authorities for his development, subject to numerous conditions, including Corps' permit approval.  ECF No. 46, Ex. 37 at US_000458-462, 473.  Mr. LeFave then met with a local businessman, Mr. Dominik Goertz, to seek investment capital for his development.  ECF No. 47, Ex. 38 at 26.  After reviewing Mr. LeFave's development plan and receiving appraisals of the property, Mr. Goertz advised I.H.T. Corporation (IHT), a Florida real estate company, to invest.  Id. at 25-28.  In 2008,

---

[3]     Later, in a November 9, 2009 letter, ESA, the environmental consulting firm, warned Mr. LeFave of significant pushback from local residents that "might push the project into a heightened public concern category."  ECF No. 47, Ex. 29 at 7.  Once a project falls into the heightened public concern category, state permitting authority shifts from the Southwest Florida Water Management District to the Trustees, meaning the Governor of Florida's approval is required.  Id.

IHT loaned $750,000 to Mr. LeFave, secured by a mortgage on the property. ECF No. 47, Ex. 39 at LB000006-07. Mr. LeFave later defaulted on the loan, and in June, 2010, the Florida court granted summary judgment to IHT on the foreclosure. ECF No. 48, Ex. 43 at LB000065. The Florida court found that the total amount due and owing was $875,878.02, and held that "[i]f the total sum with interest and all costs of this action are not forthwith paid, the Clerk of Court shall sell the property at public sale" in accordance with Fla. Stat. § 45.031 (1995). Id. On September 3, 2010, an advertised public foreclosure sale was conducted, and IHT purchased the property for $15,200. ECF No. 48, Exs. 41-44.

In September 2011, Mr. Goertz obtained another feasibility report from DMK regarding development of the property. ECF No. 46, Ex. 2. DMK advised that "the majority of the site contains Category I wetlands which are those wetlands considered critically necessary to sustain the health of [Charlotte County's] environment," and stated that any development would need to comply with Charlotte County's newest "Comprehensive Plan." Id. at LB000247. Approved by the Charlotte County Board of County Commissioners on July 20, 2010, the Comprehensive Plan was designed to avoid or mitigate impacts to local wetlands via wetlands restoration or local wetland mitigation credit banking, if available. Id.

Subsequently, IHT, along with two other entities, TSCK Investment, LLC and Real Investment, LLC (which Mr. Goertz owns), created Lemon Bay, a limited liability company, to develop the property. ECF No. 41, Ex. C ¶¶ 3-4; ECF No. 47, Ex. 38 at 42-46. Mr. Goertz is a managing member and an authorized agent of Lemon Bay through Real Investment. ECF No. 41, Ex. C ¶ 1; ECF No. 47, Ex. 38 at 19, 22. IHT transferred the property to Lemon Bay in November 2011, for $10. ECF No. 30, Ex. F.

Lemon Bay began efforts to develop the property, proposing to fill 1.95 acres of the 5.64-acre property and construct a 12-unit single family townhome development instead of the 39 condominiums (the "Project"). ECF No. 41, Ex. C ¶¶ 6-7. In February and April 2012, Lemon Bay applied to the Southwest Florida Water Management District ("SWFMD") and Corps for required permits. ECF No. 41, Ex. D at 3; ECF No. 41, Ex. I at 2. In December 2012, Lemon Bay received an Environmental Resource Permit from the SWFMD. ECF No. 41, Ex. D at 1. This permit expired on January 5, 2018. ECF No. 48, Ex. 58.

The Corps issued a public notice regarding the Project and received over 200 letters in opposition. ECF No. 48, Ex. 59; ECF No. 48, Ex. 60 at LB-ID_002187. The federal Environmental Protection Agency ("EPA") and National Marine Fisheries Service expressed concerns regarding the Project's impact on mangrove wetlands, marine habitats, and local fish and wildlife. ECF No. 48, Ex. 60 at LB-ID_002185-87. The EPA in particular designated the mangrove wetlands on the property to be "aquatic resources of national importance (ARNI)" and stated that the Project did not comply with Section 404(b) of the Clean Water Act, "which prohibit[s] avoidable or significant adverse impacts to the aquatic environment." ECF No. 49, Ex. 61 at 2.

Obtaining a Section 404(b) permit presented another hurdle for Lemon Bay. In accordance with applicable federal regulations, the Corps presumes less environmentally damaging alternative sites for non-"water dependent" proposed developments exist. 40 C.F.R. § 230.10(a)(3); ECF No. 41, Ex. E at 39, ¶ 5.1. Under federal regulations, a development is "water-dependent" when "the activity associated with a discharge which is proposed for a special aquatic site" requires "access

or proximity to[,] or siting within[,] the special aquatic site in question to fulfill its basic purpose." 40 C.F.R. § 230.10(a)(3). The Corps determined that Lemon Bay's proposed development was non-water dependent because the Project's "basic project purpose" was "to construct houses, [and did] not require access . . . [to] a special aquatic site." ECF No. 41, Ex. E at 39.

The Corps cannot issue a Section 404(b) permit for a non-water dependent development unless the applicant "clearly demonstrate[s]" that no alternative sites are available. 40 C.F.R. § 230.10(a)(3); ECF No. 41, Ex. E at 38, ¶ 5.0. This requirement is known as the "least environmental[ly] damaging practicable alternative" test. ECF No. 41, Ex. E at 39, ¶ 5.1. Lemon Bay submitted a "Practical Alternatives Narrative" in December 2012, which analyzed three proposed alternative sites in the Charlotte County area. ECF No. 49, Ex. 63 at SAJ_AR-790. Of the three, two were not for sale and the third would have cost $1.25 million to purchase. Id. at SAJ_AR-790-91. Lemon Bay further represented that, as the property was acquired due to foreclosure, development of this specific land was the only way for the "lender, and now current owner" to avoid "incurring a total loss on this investment." Id. at SAJ_AR-00789.

In an attempt to make the Project "water-dependent," in February 2013, Lemon Bay amended the Project application to include a 13-slip dock: this necessitated a new public notice period. ECF No. 49, Ex. 65. According to the Corps, inclusion of the dock raised new concerns regarding the West Indian manatee and ran afoul of the Endangered Species Act and the Marine Mammal Protection Act. ECF No. 49, Ex. 66. Lemon Bay responded by reducing the number of slips on the dock from 13 to nine, and another public notice period commenced. ECF No. 49, Ex. 67. The parties' back and forth continued for two-and-a-half years, with the Corps contending that Lemon Bay had not adequately demonstrated that no less environmentally-damaging alternative sites existed, and Lemon Bay arguing that the Project was the "lowest impact possible to allow the owner to recoup the losses that were previously incurred." ECF No. 49, Ex. 70 at SAJ_AR_01223-32.

The Corps denied Lemon Bay's permit application with prejudice on February 1, 2016, finding that it did "not comply with Section 404(b)(1) guidelines" and was "contrary to the public interest." ECF No. 41, Ex. F. Lemon Bay administratively appealed the decision on March 29, 2016; the Corps denied that appeal on December 19, 2016. ECF No. 41, Ex. I at 25.

**Procedural History**

Lemon Bay filed this action on March 27, 2017, and filed its amended complaint on May 4, 2017. ECF No. 1; ECF No. 5. In its four-count amended complaint, Lemon Bay alleges four takings theories. Counts I and III allege "categorical" takings of Lemon Bay's "vested statutory right to bulkhead and fill the property," and of the property itself, under Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). Am. Compl. ¶¶ 49, 70. Counts II and IV allege "regulatory" takings under the factors set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978), of the same "vested statutory right" and of the property. Am. Compl. ¶¶ 61, 82.

Lemon Bay moved for partial summary judgment on Counts I and III, its Lucas categorical taking claims, but did not seek summary judgment on Counts II and IV, its Penn Central regulatory takings claims. Defendant moved for summary judgment on all counts. The Court heard oral

argument on the cross motions in Fort Myers, Florida, on November 22, 2019, and December 3, 2019, via telephone.

## Discussion

### Summary Judgment Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A fact is material if it "might affect the outcome of the suit." Id. at 248. The moving party bears the burden of establishing the absence of any material fact, and any doubt over factual disputes will be resolved in favor of the non-moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. at 256-57. If the non-movant does so, there is a genuine issue of fact that requires a trial. Id. at 257.

A court does not weigh each side's evidence when considering a motion for summary judgment, but the "inferences to be drawn from the [underlying] facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus Constructors, 812 F.2d at 1391. Cross-motions for summary judgment "are not an admission that no material facts remain at issue," since "the separate summary judgment motions of each party may focus on different legal principles" and rely on different sets of facts. Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citing United States v. Fred A. Arnold, Inc., 573 F.2d 605, 606 (9th Cir. 1978)). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id. "[S]ummary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues." Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006); Blue Lake Forest Prod., Inc. v. United States, 86 Fed. Cl. 366, 381 (2009).

### Regulatory and Categorical Takings

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "Supreme Court precedent has long recognized that a taking can be accomplished by a physical invasion of the property or by the imposition of a governmental regulation." Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1365 (Fed. Cir. 2004). When a taking by government regulation is alleged, "a court must typically conduct a complex factual assessment to determine whether compensation is owed to the property holder." Id.; see also Penn Central, 438 U.S. at 124 (describing analysis of regulatory takings claims as "essentially ad hoc, factual inquiries" dependent largely "upon the particular circumstances in that case") (internal quotations omitted). "Thus, due to the 'fact-intensive' nature of takings claims, courts are typically reluctant to decide such claims at the

summary judgment stage, preferring to wait for a trial to fully develop the factual record." Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 466 (2009).

"Under Penn Central, courts use a three-factor analysis to assess claimed regulatory takings: (1) character of the governmental action, (2) economic impact of the regulation on the claimant, and (3) extent to which the regulation interfered with distinct investment-backed expectations." Cienega Gardens v. United States, 331 F.3d 1319, 1337 (Fed. Cir. 2003); Guggenheim v. City of Goleta, 638 F.3d 1111, 1120 (9th Cir. 2010) (stating that Penn Central's reference to "distinct" means "capable of being easily perceived, or characterized by individualizing qualities" and "'[d]istinct investment-backed expectations' implies reasonable probability" of recovery on the investments).

The first factor addresses whether a burden benefiting the public was "placed disproportionately on a few private property owners." Cienega Gardens, 331 F.3d at 1338. The second factor, the economic impact of the regulation on the claimant, is "measured by the change, if any, in the fair market value caused by the regulatory imposition." Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560, 1567 (Fed. Cir. 1994) (internal citation omitted). "In determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation" is considered. Id.

Under the third factor, a plaintiff must demonstrate objectively reasonable investment-backed expectations. Good v. United States, 189 F.3d 1355, 1360 (Fed. Cir. 1999); see Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06, (1984) ("A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need.") (internal quotations omitted). This factor incorporates "an objective, but fact-specific inquiry into what, under all the circumstances, the [plaintiffs] should have anticipated." Cienega Gardens, 331 F.3d at 1346.

In Lucas, the Supreme Court set forth a specific rule for a narrow subset of regulatory takings cases: compensation is required "where [a] regulation denies all economically beneficial or productive use of the land." 505 U.S. at 1015. Commonly referred to as "categorical" takings, such cases are rare--Lucas's holding is limited to the "extraordinary circumstance" where absolutely "no productive or economically beneficial use of land is permitted." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 330 (2002) (emphasis omitted). See, e.g., Lost Tree Village Corp. v. United States, 115 Fed. Cl. 219, 231 (2014), aff'd, 787 F.3d 1111 (Fed. Cir. 2015) (determining that when the Corps denied a central Florida property owner a Section 404 permit, the value of the property with a permit would have been $4,245,387.93 but without the permit, only $27,500, and that this 99.4% diminution of value "constitute[d] a categorical taking under Lucas").

If a court finds that a Lucas "categorical" taking has occurred, the takings inquiry ends, and no analysis under Penn Central is performed. "Only when a taking is non-categorical does the court embark on the fact-based inquiries dictated by Penn Central." Sartori v. United States, 67 Fed. Cl. 263, 274 (2005) (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003)). For that reason, the Federal Circuit has stated that "it is often important to determine at the outset whether a particular claimed taking was 'categorical' or not." Rith Energy, Inc. v. United States, 247 F.3d 1355, 1362 (Fed. Cir. 2001) (on rehearing).

**<u>Genuine Issues of Material Fact Preclude Summary Judgment on Lemon Bay's Claims</u>**

In its amended complaint, Lemon Bay alleges regulatory takings under both <u>Penn Central</u> and <u>Lucas</u>. Thus, the economic impact of the permit denial on Lemon Bay, Lemon Bay's reasonable investment-backed expectations in development of the property, whether Lemon Bay has been deprived of all economically beneficial or productive use of the property, and the diminution in property value caused by the permit denial are integral to Lemon Bay's claims. <u>Penn Central</u>, 438 U.S. at 124; <u>Lucas</u>, 505 U.S. at 1015. As stated above, a genuine dispute of fact exists if an issue could "reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250.

The Court finds that genuine disputes of material fact exist as to:

- The reasonableness of IHT's investment-backed expectations.

    o Plaintiff argues that it had reasonable investment-backed expectations because the right to bulkhead and fill accompanied the original sale of the property, similar development existed nearby,[4] Charlotte County had granted preliminary site approvals for development of the property in November 2007, and SWFMD approved an Environmental Resource Permit in December 2012. ECF No. 52 at 27-28; ECF No. 41 at 4, ECF No. 47, Ex. 37 at US_000458-462, 473; ECF No. 41, Ex. D at 1.

    o Defendant argues that Plaintiff had no reasonable investment-backed expectations that it would be able to bulkhead and fill the property, as Lemon Bay and its predecessor-in-interest, Mr. LeFave, had been warned that development approvals could be difficult to obtain due to the protected wetlands on the property. ECF No. 46 at 13-14, 16-17. The extent to which any such warnings addressed obtaining the Corps permit is unclear. Deposition testimony of Mr. Kreg Maheu, a DMK employee, indicates that DMK warned Mr. LeFave in 2007 "that there were going to be some hurdles he would have to overcome with [SWFMD] and the Corps of Engineers for his permitting and that there was a risk associated with it." ECF No. 47, Ex. 27 at 36. Mr. Maheu testified that, in connection with its September 2011 report evaluating the feasibility of the property's successful development, DMK warned Mr. Goertz about "risks" associated with developing the property. <u>Id.</u> at 94. The record lacks details on the specifics of these conversations, or the nature of the referenced risks.

- The character of the Governmental action.

    o Lemon Bay argues that the relative burden of the permit denial to it significantly outweighs any minor benefit to the public in preserving the property's mangrove wetlands and associated plant and animal habitat, as the property at issue is ".018 percent of the total mangrove shoreline of Charlotte Harbor." ECF No. 64 at 104-05. Further, in Lemon Bay's view,

---

[4] The record lacks any specifics about such similar nearby development. <u>See</u> ECF No. 52 at 28.

       the permit denial means that Lemon Bay "can't use the property at all." Id. at 104.

- o Defendant contends that Lemon Bay "is not being singled out or treated differently from any other owners of property in the area," as any owner of similar mangrove wetlands would be subject to the same Corps permit requirement. ECF No. 64 at 77-78.

- The amount of IHT's investment in the property.

  - o Lemon Bay argues that IHT's interest in the property originated with its $750,000 loan to Mr. LeFave in 2008, and that $750,000 is an accurate appraisal of IHT's investment (and potential loss) in the property. ECF No. 46 at 15; ECF No. 41 at 4; ECF No. 52 at 2.

  - o Defendant posits that Lemon Bay's investment was only $15,200, as IHT purchased the property for $15,200 at the 2010 foreclosure auction.[5] ECF No. 46 at 35.

- The property's value with and without the permit.

  - o Based upon the opinion of its expert appraiser, Mr. Linwood Gilbert,[6] Lemon Bay alleges that, assuming the property's "highest and best use," the value with the permit would be $3,885,000, while without the permit, the property is only worth $12,500. ECF No. 41 at 9.

  - o Defendant's expert, Mr. Carlson,[7] determined that the property would be worth $570,000 without the permit if used to generate Transfer Density

---

[5]    Defendant notes that Lemon Bay itself paid only a "$10 nominal investment" to acquire the property from IHT. ECF No. 46 at n.17. Given IHT's ownership interest in Lemon Bay, Defendant attributes IHT's $15,200 investment in the property to Lemon Bay for the exclusive purpose of its motion for summary judgment, and "reserves the right to argue that IHT and Lemon Bay should be treated as entirely separate corporate entities for the purpose of the takings analysis." Id.

[6]    Mr. Gilbert is certified by the State of Florida as a "General Real Estate Appraiser" and is the principal of Urban Realty Solutions, a Florida real estate research and appraisal firm. ECF No. 41, Ex. L at 1, 7. He has a B.A. in Business Administration from the University of Georgia, and has over 40 years of real estate appraisal experience in Florida. Id. at 1, 9.

[7]    Mr. Carlson is certified by the state of Florida as a "General Real Estate Appraiser," and has a private real estate appraisal and consultation practice, Carlson, Norris and Associates, Inc., in Fort Myers, Florida. ECF No. 49, Ex. 74 at 4-5. He holds a B.S. in Business Administration from the University of Southern Mississippi and has served as a Special Magistrate to the Lee and Charlotte County Value Adjustment Boards. Id. at 173, 178.

Units ("TDUs").[8] ECF No. 46 at 26. As Defendant acknowledges, "there is a genuine issue of material fact regarding the value of the property before and after the permit denial, and thus, the economic impact of the Corps' action." ECF No. 46 at 26.

- Whether a market exists for the TDUs the property would generate.

  - Defendant's expert, Mr. Andy Dodd,[9] stated that, even without the permit, the property could be used to generate 42 TDUs, and "could be sold for between $504,000 and $630,000 in the Charlotte County TDU market." ECF No. 46 at 24.

  - Plaintiff's expert, Dr. Henry H. Fishkind,[10] disputed Mr. Dodd's opinion, stating that it is "highly unlikely and speculative that [the Lemon Bay Cove TDUs] . . . could command premium pricing," given the "oversupply of almost 84%" in the TDU market. ECF No. 52, Ex. H at 7. Another of Plaintiff's experts, Mr. David W. Depew,[11] stated that only 9.4% of available TDUs in Charlotte Country have been used over the last 15 years. ECF No. 52, Ex. G at 11.

Given these genuine disputes of material fact and the lack of adequate development of the record at this juncture, summary judgment may not be granted for either party.

---

[8]  A real estate developer can purchase TDUs as "offsets" to mitigate the environmental impact of a proposed development. See ECF No. 47, Ex. 25 at US_001426-38. Lemon Bay itself proposed purchasing "mitigation credits" in its application to a Florida water management district for a permit for the Project. Id.

[9]  Mr. Dodd is a licensed real estate broker in Charlotte County, Florida who owns a local real estate company, Peninsula Property. ECF No. 49, Ex. 73. Mr. Dodd has "specialized in the Charlotte County Transfer Density Unit market since 2004," and assisted with the drafting and adoption of Charlotte County's 2004 Transfer Density Unit ordinance. ECF No. 46 at 50; ECF No. 49, Ex. 73 at 4.

[10]  Dr. Fishkind is an economist and the President of Fishkind & Associates, Inc., a Florida-based economic and financial consulting firm. ECF No. 41, Ex. K at 1. He has a Ph.D. in economics "with specialties in Urban and Regional Economics and in Econometrics." Id.

[11]  Dr. Depew is "a Principal and Co-founder of Morris-Depew Associates, Inc., a land-planning, civil engineering, landscape architecture and surveying firm" in Fort Myers, Florida. ECF No. 52, Ex. G at 1. He has Ph.D. from Kennedy Western University, specializing in public administration. ECF No. 41, Ex. B at 2. He has approximately 35 years of experience as a land planner in Florida. Id.

## **Conclusion**

    Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment are **DENIED**.

                                     s/Mary Ellen Coster Williams
                                     **MARY ELLEN COSTER WILLIAMS**
                                     **Senior Judge**