# In the United States Court of Federal Claims

**No. 17-436L**
**(Filed: July 15, 2022)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| **LEMON BAY COVE, LLC,** | * | **Fifth Amendment Taking; Army Corps of** |
| | * | **Engineers' Denial of Permit to Bulkhead** |
| **Plaintiff,** | * | **and Fill; Categorical <u>Lucas</u> Taking; <u>Penn</u>** |
| | * | **<u>Central</u> Regulatory Taking.** |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

<u>David Smolker</u> and <u>Allison Doucette</u>, Smolker Mathews, LLP, 100 S. Ashley Drive, Suite 1490, Tampa, FL 33602, for Plaintiff.

<u>Jean E. Williams</u>, <u>Frank J. Singer</u>, <u>Claudia Antonacci Hadjigeorgiou</u>, and <u>Hayley A. Carpenter</u>, United States Department of Justice Environment & Natural Resources Division, Natural Resources Section, P.O. Box 7611, Washington, D.C. 20044, for Defendant.

<u>David J. Deerson</u>, Pacific Legal Foundation, 930 G Street, Sacramento, CA 95814, for Amicus Curiae Pacific Legal Foundation, Rodney E. Shands, Robert E. Shands, Robert E. Shands, Jr., Anna Kathryn Shands Edwards, and Thomas A. Shands.

---

## POST-TRIAL OPINION

---

**WILLIAMS**, Senior Judge.

This Fifth Amendment taking case comes before the Court following a trial on liability and damages. Plaintiff, Lemon Bay Cove, LLC ("Lemon Bay"), seeks $3,800,000 as just compensation for a taking of its property containing submerged land and mangroves. Alleging a categorical taking claim, Plaintiff contends that the United States Army Corps of Engineers' denial of a permit to bulkhead and fill 2.08 acres deprived it of all economically beneficial use of its land. Alternatively, Plaintiff claims the denial of the permit was a regulatory taking under <u>Penn Central Transportation Company v. City of New York</u>, 438 U.S. 104 (1978), in light of its distinct investment-backed expectations, the character of the governmental action, and the permit denial's economic impact.

Although the Corps' permit denial prevented Plaintiff from developing the project it proposed, Plaintiff has not established that this discrete permit denial deprived Plaintiff of all beneficial economic use of its property.  Despite the Corps' repeated requests that Plaintiff minimize its footprint on the wetlands, Plaintiff never sought a permit for a development with less impact on wetlands and protected species.  Rather, Plaintiff persisted in requesting a 12-unit 2.08-acre development to meet its own financial needs.  As such, Plaintiff has not demonstrated a categorical taking that denied all potential development or all productive or economically beneficial use of its land.

Nor has Plaintiff demonstrated the elements of a regulatory taking.  First, Plaintiff failed to establish that it had reasonable investment-backed expectations in its development project because as Plaintiff knew, both federal and state regulatory regimes imposed significant restrictions on developing wetlands that could ultimately prevent it from developing the land.  Second, Plaintiff failed to demonstrate that the governmental action of protecting wetlands resulted in a disproportionate burden on Plaintiff which should have been borne by the public.  Finally, Plaintiff failed to demonstrate a substantial economic loss attributable to the Corps' permit denial as there were other state and local hurdles affecting its development that Plaintiff had not met.

## Findings of Fact[1]

## Lemon Bay's Acquisition of the Property

Plaintiff Lemon Bay is a limited liability company that owns 5.64 acres of submerged lands, mangroves and scattered isolated uplands on Sandpiper Key in Charlotte County, Florida.  Tr. 55-56; JX 140 at 16.  Lemon Bay was formed in 2011, solely for the purpose of developing this property.  Tr. 57-58.  Dominik Goertz is the day-to-day managing member and authorized agent of Lemon Bay and was Lemon Bay's corporate representative in this proceeding.  Tr. 55; Stip. ¶ 42.  Mr. Goertz also has been a consultant and financial advisor to I.H.T. Corporation, a Florida real estate company owned by his business partner.  Tr. 57; Stip. ¶ 42.

The property at issue consists of three parcels and abuts and lies partially beneath the tidal waters of Lemon Bay.  Stip. ¶ 3.  In 1986, the Florida legislature designated the submerged lands in the Lemon Bay estuarine system as the Lemon Bay Aquatic Preserve.  Stip. ¶ 4.  The property is comprised of tidal habitats such as tidal flats, seagrass beds and mangroves, and the submerged part of the property serves as a habitat for birds, fish, sea turtles and the West Indian manatee.  Stip. ¶¶ 5, 7.

In 1954, Earl Farr purchased the entirety of Sandpiper Key, containing 33.2 acres, from the Florida Trustees -- the Florida Governor and Cabinet.  JX 2; Tr. 338.  In 1955, Mr. Farr sold the entire tract of land, a portion of which contained the Lemon Bay property, to John Stanford.  JX

---

[1]     These findings of fact are derived from the record developed during a 10-day trial, which took place via Zoom videoconferencing.  Additional findings of fact are in the Discussion section.  The Court uses "PX," "DX" and "JX" to designate exhibits admitted during trial and "Tr." to cite trial testimony.  The parties' Stipulations of Fact (ECF No. 111) are cited as "Stip."  Grammatical errors in quotations from the record have not been corrected.

3.  In 1960, Charlotte County granted Mr. Stanford a permit to fill "portions of the parent tract, including the [Lemon Bay] Property" and, in 1961, both the Trustees and Army Corps of Engineers approved a fill permit for land that included the Lemon Bay property.[2]  Stip. ¶ 18; DX 2; DX 3; DX 4.  By 1970, Mr. Stanford had filled the northwest portion of Sandpiper Key, but the area that constitutes Lemon Bay's property remained unfilled and undeveloped.  Stip. ¶ 19; Tr. 593-94.  In 1980, Sandpiper Key Associates acquired the entire 33.2-acre tract of Sandpiper Key from Mr. Stanford for $1,726,699.93 and constructed a 79-unit condominium development, the Sandpiper Key Condominium Complex, on the portion of the property that had been filled.  JX 9; Stip. ¶ 22. The wetlands containing Lemon Bay's property remained untouched.  Stip. ¶¶ 19, 23.

By the early 1990's, Sandpiper Key had stopped paying real estate taxes on the undeveloped portion of the tract.  JX 10 at 1-3; Tr. 594; Stip. ¶ 24.  In August 1993, Gerald LeFave purchased three parcels of this unfilled tract, totaling 5.62 acres, at a tax sale from Charlotte County for $12,100 and sought to develop the property, eventually seeking approval to build a 39-unit development.  Stip. ¶ 25; JX 10 at 1-3.  Mr. LeFave did not submit his proposal to the Southwest Florida Water Management District or to the Army Corps of Engineers – only to Charlotte County. Tr. 564, 568.  In November 2007, Mr. LeFave obtained preliminary site plan approval from Charlotte County for his development subject to 34 conditions.  Stip. ¶ 32; JX 23.  Upon obtaining this preliminary approval, Mr. LeFave sought investment capital for his development, the Verandahs at Lemon Bay.  Stip. ¶ 34; Tr. 59-60, 63.

In 2008, I.H.T. Corporation, on the advice of Mr. Goertz, its financial advisor, loaned Mr. LeFave $750,000 secured by this 5.62-acre property.  Stip. ¶ 36; Tr. 56-58; JX 25.  In Mr. Goertz's view, this loan functioned as a mortgage that would be repaid when the borrower obtained the resources to proceed with development and then be converted into a construction loan.  Tr. 56-57. As a condition of the loan, Mr. LeFave agreed to provide I.H.T. with copies of invoices for obtaining "developmental entitlements for the property."  JX 25 at 2.  At the time of the loan, Mr. Goertz was aware that Mr. LeFave had been advised of challenges in obtaining permits for the property.  Mr. Goertz testified:

> Q: COUNSEL FOR DEFENDANT: Do you know whether DMK[3] informed Mr. LeFave that his planned development would not be easy to permit because of the impacts to wetlands on the property?
>
> …
>
> A: MR. GOERTZ:    Yes, we were aware, not at each level, but we were aware about the red flags that Mr. LeFave has to work on.

---

[2]    Although the Corps has regulated activities in United States waters since the 1890's, the permit at issue here, a Section 404 permit, did not come into play until 1975, with the promulgation of the Section 404(b)(1) Guidelines.  40 Fed. Reg. 31,320 (1975).

[3]    DMK Associates is an engineering and land surveying firm in Florida.  JX 26.  Mr. LeFave hired DMK for his 39-unit condominium development project, and Lemon Bay later hired DMK to assist with its proposed development of the same property.  Tr. 124, 141-42; Stip. ¶ 52.

Tr. 124-25.

When determining whether to extend the loan, I.H.T. requested an appraisal of the property and the development plan from Mr. LeFave. Tr. 61-63. The appraisal, prepared by Certified Appraisal Services, Inc. on April 5, 2007, for Fusion Mortgage Corporation of Tampa, Florida, stated that the site:

> has some mangroves and wetlands but is considered an excellent location for multi family development. There are condominiums all along Beach Road which demonstrates the success of multi family development in the area.

PX 12 at 3. The stated "intended use" of the appraisal was "to assist the client in arriving at a[] 'Subject to Entitlements' Market Value with a zoning designation of RMF-10 (Residential Multi Family 10 Units per acre)." PX 12 at 4. The appraisal defined entitlements as "secured legal permissions from regulatory bodies (typically in the form of <u>permits</u>, but sometimes in the form of re-<u>zoning</u> or <u>planned unit developments</u>)." <u>Id.</u> (emphasis in original). The appraisal valued the 5.62-acre property at $4,740,000 when developed into multi-family housing, which the appraisers considered the highest and best use of the property, but did not state the number of housing units. PX 12.

In June 2010, Mr. LeFave defaulted on the I.H.T. loan, and a Florida court granted summary judgment to I.H.T. in the foreclosure proceeding, awarding I.H.T. $875,878.02. JX 33; JX 36 at ⁋⁋ 3, 7. According to the final foreclosure judgment, this amount included $750,000 in principal, plus a $75,000 late fee, $46,027.52 in interest, $2,500 in attorney's fees, and $2,350.50 in costs. JX 36 at ⁋ 6.

A foreclosure sale was held on September 3, 2010. JX 41. According to the foreclosure judgment, I.H.T. was allowed to bid at the sale, and if successful, was entitled to a credit on its bid up to the full amount due under the judgment after the payment of costs. JX 36 at 3; <u>see</u> JX 40, JX 41. Under Florida law, the foreclosing mortgagee receives a bidding credit amounting to the principal and interest due under the mortgage and its costs of foreclosing. <u>See generally</u> <u>RadLAX Gateway Hotel, LLC v. Amalgamated Bank</u>, 566 U.S. 639, 649 (2012) (stating that secured creditors have a right to credit-bid at bankruptcy auctions); <u>Branch Banking & Trust Co. v. Tomblin</u>, 163 So. 3d 1229, 1230 (Fla. Dist. Ct. App. 2015) (noting that credit bidding is a judicially created right to bid at a foreclosure sale the amount due on first mortgage debt). At the foreclosure sale, I.H.T., using its credit bid and a payment of $15,200, purchased the property. JX 36 at ¶ 10; JX 40; JX 41.

Once I.H.T. obtained possession of the property, Mr. Goertz, in his role as I.H.T.'s financial advisor, advised I.H.T. to move the property to a development company. Tr. 55, 58. In November 2011, after determining that I.H.T. would be unable to recoup its investment by selling the property as-is, Mr. Goertz and Nils Richter[4] "decided to develop the property . . . and formed a development company [Lemon Bay]" for that purpose. Tr. 57, 139. I.H.T. then "moved the assets, the judgment, and all the rights to develop the property into [Lemon Bay]." Tr. 57. I.H.T. became a

---

[4] Mr. Richter was a real estate agent and a "very close business associate" of Mr. Goertz for over 20 years. Tr. 137.

member of Lemon Bay and sold the property for $10 via quitclaim deed to Lemon Bay on November 9, 2011.  JX 47; Tr. 57-58.  Mr. Goertz considered the 2010 Florida court judgment awarding I.H.T. $875,878.02 on Mr. LeFave's defaulted loan to be I.H.T.'s "investment" in the property.  Tr. 139.

## Charlotte County Zoning Requirements

The property Lemon Bay acquired was subject to Charlotte County's land development regulations, called the Manasota and Sandpiper Key Zoning District Overlay, codified in Section 3-9-50 of Charlotte County's laws and ordinances.  JX 138 at 6.  The District Overlay land development regulations include 10 zoning districts including Manasota environmentally sensitive (MES), as well as single-family and multifamily districts, and several commercial and special districts.  JX 138 at 8-9.  At the time of both I.H.T.'s loan in 2008, and Lemon Bay's acquisition in 2011, the property was zoned MMF-7.5, which allowed for single and multi-family residential use at a density of up to 7.5 units per acre.  PX 1 at 6; Tr. 510.  This zoning permitted a maximum of 42 units on the property.  Tr. 793.

## The Charlotte County and Southwest Florida Restrictions on Wetland Development

Lemon Bay's property contains Category I wetlands, defined as "critically necessary to sustain the health of the County's environment," and a landowner must receive approval from Charlotte County in order to develop this type of property.  JX 44 at 40.  To obtain site plan approval from Charlotte County, the property must conform to the County's Comprehensive Plan, which restricts development of Category I wetlands to "cases where no other feasible and practicable alternative exists that will permit a reasonable use of the land."  JX 44 at 41.

According to the Charlotte County Comprehensive Plan:

Category I wetlands are those wetlands that are considered critically necessary to sustain the health of the County's environment and shall mean those wetlands that meet at least two of the following criteria:

1. Any wetland of any size that has a permanent surface water connection to natural surface waterbodies with special water classifications, such as an Outstanding Florida Water, an Aquatic Preserve, or Class I or II waters. . . .
2. Any wetland of any size that has a direct connection to the Floridan aquifer by way of an open sinkhole or spring.
3. Any wetland of any size that has functioning hydroperiods with minimal human disturbance and provides critical habitat for listed species.
4. Any wetland of any size whose functioning hydroperiods are connected via a direct natural surface water connection to parks or conservation lands.
5. Any wetland of any size where downstream or other hydrologically connected habitats are significantly dependent on discharges from the wetland.

JX 44 at 40.

According to Ian Vincent, Defendant's expert in environmental permitting and environmental land use approval in Southwest Florida, Lemon Bay's wetlands met criteria 1, 3,

and 4 of the Comprehensive Plan's criteria for being "critically necessary" for the health of the County's environment.  Tr. 1644-46.  In order to develop such wetlands, in addition to meeting the Comprehensive Plan, a developer had to obtain an Environmental Resource Permit ("ERP") from the Southwest Florida Water Management District ("SWFWMD").

### The Clean Water Act and Section 404(b) Permit Requirements for Wetlands

The objective of the Clean Water Act ("CWA") is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  40 C.F.R. § 230.1(a) (2020).  The Clean Water Act delegates responsibility to the Army Corps of Engineers to "protect wetlands subject to the Corps' jurisdiction from unnecessary destruction."  Deltona Corp. v. United States, 657 F.2d 1184, 1188 (Ct. Cl. 1981); Fla. Rock Indus., Inc. v. United States, 791 F.2d 893, 904 (Fed. Cir. 1981); see 33 U.S.C. § 1344(d).  In recognition of this objective, the CWA prohibits the discharge of dredged or fill material into waters of the United States unless a permit, issued by the Army Corps of Engineers under Section 404 of the CWA, authorizes such discharge.  33 U.S.C. §§ 1311(a), 1344(a).

In deciding whether to approve a Section 404 permit to dredge and fill, the Corps looks to the Section 404(b)(1) guidelines outlined in 40 C.F.R. § 230.10.  The intent of the Section 404 permit determination is to ensure that there be "no net loss of functions and values of wetlands." Tr. 969.  According to Tunis McElwain, the Chief of the Jacksonville District Corps of Engineers, "wetlands have…functions and values.  So functions are things like water retention, flood water retention, or the filtering of water…. Habitat, wildlife habitat is another example of a function. And then values are things like aesthetics and…more general things that wetlands provide."  Tr. 971.

Under the Section 404(b)(1) Guidelines, the Corps may only issue a Section 404 permit if it concludes that the proposed project is the "least environmentally damaging practicable alternative."  40 C.F.R. § 230.10(a)(2) (2020).  The Corps may not grant a permit if there is a practicable alternative that would have a less adverse impact on the aquatic ecosystem than dredging and filling.  40 C.F.R. § 230.10(a).  For non-water dependent projects, the Corps presumes that less environmentally damaging practicable alternatives are available unless clearly demonstrated otherwise.  See Tr. 975.

 To determine whether a project is the least environmentally damaging practicable alternative, the Corps reviews the project's avoidance, minimization, and mitigation of adverse impacts on the aquatic ecosystem.  Tr. 966; see also 40 C.F.R. § 230 (2020).  Under the Section 404 program, a potential permittee is first expected to "avoid" deliberate discharge of materials into wetlands, then to "minimize" unavoidable discharge impacts, and finally to effect compensatory "mitigation" of any remaining impacts through restoration, embankment, creation, or, in exceptional circumstances, preservation of other on- or off-site wetlands or aquatic resources.  40 C.F.R. § 230 (2020).

Avoidance is the first step in the Corps' evaluation sequence because there is a presumption that alternative sites are available that would avoid impacts to the waters of the United States completely.  Tr. 970.  If avoidance is not possible, the Guidelines call for minimization of the impact to the waters, such as changing a site plan configuration to reduce impacts to the higher

quality wetlands.  Id.  Finally, mitigation entails the replacement of the wetlands' functions that would be lost due to the proposed project's environmental impacts.  Tr. 970-71.

**Lemon Bay's Permit Applications and the Corps' Responses**

Prior to submitting any permit applications, Lemon Bay sought to include a dock on the southern edge of the property which extended into the state-owned Lemon Bay Aquatic Preserve. JX 82.  In a pre-application meeting, the SWFWMD informed Lemon Bay that including a dock that was on state sovereign lands in the permit application for the ERP could push the application into the "Heightened Public Concern" category, which would require approval from the Trustees of the Internal Improvement Trust Fund.  JX 81 at 1; Tr. 144.  Lemon Bay decided to defer requesting the SWFWMD to review the proposed dock until the residential portion of the project was reviewed and approved.  Tr. 425-26.

In February 2012, Lemon Bay applied for the required ERP without the contemplated dock. JX 49.  On December 20, 2012, the SWFWMD granted Lemon Bay the ERP for a project that did not include a dock, subject to 18 conditions.  JX 77.  Among these conditions were requirements that manatees and sea turtles be protected from direct project effects.  Id. at 7.  This permit was set to expire after five years and did ultimately expire on January 5, 2018.  JX 77 at 3; JX 112.

In April 2012, Lemon Bay filed an application with the Army Corps of Engineers for a permit to fill approximately 1.95 acres of the submerged aquatic wetlands and construct a 12-unit single-family townhome development.[5]  Tr. 28, 987-88; JX 51.  In accordance with Corps' policy, the Corps issued a public notice inviting comments on Lemon Bay's proposed fill plan on May 3, 2012.  JX 51.  In its public notice, the Corps "determined the proposed project may affect, but is not likely to affect" various species of endangered aquatic animals and that "the proposed action would have a substantial adverse impact on [Essential Fish Habitat] EFH."  JX 51 at 3-4 (emphasis in original); Tr. 1285.  The notice explained that "the Corps [would] request [United States Department of Interior, Fish and Wildlife Service's] and National Marine Fisheries Service's (NMFS) concurrence" with its endangered species determination, and that its "final determination relative to project impacts and the need for mitigation measures [was] subject to review by and coordination with the National Marine Fisheries Service."  JX 51 at 3-4.[6]

In response to the public notice, the Corps received over 200 letters from agencies, adjacent property owners and residents in the surrounding area, citing environmental concerns based on, inter alia, Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403), Section 404 of the

---

[5]     Lemon Bay expanded the footprint to 2.08 acres in late 2012.  Stip. ¶¶ 51, 82; see JX 51 at 1 and JX 74 at 6.

[6]     Beginning in the 1960s, the Corps was obligated by the Fish and Wildlife Coordination Act to consult with the United States Department of Interior, Fish and Wildlife Service (FWS) when it made permit decisions regarding dredging, filling, excavating, and other related work in traditionally navigable waters.  Under the Endangered Species Act, which was passed in 1973, federal agencies must consult with the National Marine Fisheries Service when any action of the agency, including permitting, may affect a species listed as threatened or endangered under the Act.  See 16 U.S.C. § 1536(a)(2).

Clean Water Act (33 U.S.C. § 1344), and the Endangered Species Act (16 U.S.C. § 1531 et seq.). JX 71 at 3; JX 54, JX 64, JX 65. The comments included a statement from the NMFS that the property was an "Essential Fish Habitat" and should not be filled and a statement from the U.S. Environmental Protection Agency ("EPA") that "the proposed project may have substantial and unacceptable adverse impacts to mangroves." JX 71 at 1.

In May of 2012, a project manager from the Corps conducted an interagency site inspection with a fishery biologist from the NMFS, Mark Sramek, and a biologist from the EPA. JX 55; Tr. 1287-88. They "collectively walked the entire mangrove wetland site, and the purpose was to assess the quality…and quantity of the mangrove habitats, which are identified as essential fish habitat." Tr. 1289; DX 40. In Mr. Sramek's view, the project site contained high-quality, functioning mangrove wetlands. Tr. 1289. Based upon the interagency site inspection, the NMFS reported that the site contained aquatic resources of national importance and "provided an essential fish habitat conservation recommendation" to the Corps. Tr. 1287; 1291-92. Essential fish habitat is "essentially the backbone of the estuarine system," providing protection and forage for endangered and economically important fish species. Tr. 1074-75; see JX 108 at 49-50. The Corps determined that the mangrove wetlands were high-quality wetlands and agreed with the NMFS that they were an essential fish habitat and an aquatic resource of national importance. Tr. 1074.

On October 5, 2012, the Corps provided Lemon Bay with the public comments, and determined that Lemon Bay's proposed project was not water dependent because it did not require access to water as the basic project purpose was to construct homes. JX 71 at 4. As a result of this determination, the Corps requested that Lemon Bay provide an "alternatives analysis" to determine if the proposed project was the least environmentally damaging practicable alternative. Id.; Tr. 1030. The Corps requested Lemon Bay to provide a report "describing the search for the [alternative] sites, identification of their location and rating, and a narrative that shows which site, if any, is the preferred alternative." JX 71 at 4.

The Corps specified that the alternatives analysis should include:

a. A defined set of criteria for site evaluation;
b. A defined system for rating each site against each of the criteria; and
c. A description of the method used to comparatively weigh each rating as to its importance.

Id. The Corps also requested an "on-site alternative analysis," that referenced the set of criteria discussed in the Alternatives Analysis, compared and contrasted the on-site alternative plans, and included: "a. A description of the site plan/configuration; b. A method to estimate the environmental consequences of each plan; and c. A narrative that shows the quantity of fill is the minimum amount practicable." JX 71 at 5.

In response to the Corps' request, Lemon Bay submitted a four-page "Practical" Alternatives Narrative in December 2012, analyzing three alternative sites. JX 79 at 15. Lemon Bay emphasized that "consideration must be made for the fact that the subject parcel was not acquired by the current owner in any form of an open market transaction." Id. Lemon Bay continued:

> [t]o the contrary, the owner had no intentions to acquire this or any similar parcel for real estate developments. The additional explanation below will help clarify why the owner does not have the option to acquire any other similar waterfront property to avoid the impact to the subject site, since any additional purchase would not reduce the cost and financial losses that have already been incurred to date…[T]he borrower defaulted on the loan terms, eventually forcing the lender, and now current owner, to take possession of the parcel through foreclosure to get control of the loan collateral. At this point the new owner had to realize that the total investment in the mortgage and accrued unpaid interest and cost was at risk due to the lack of final approval or permits for the previously proposed development.

Id.

Lemon Bay submitted that avoidance was impossible based on the financial circumstances surrounding its acquisition of the property and addressed minimization and mitigation as follows:

> To mitigate the financial damage and minimize the losses incurred to date the owner has to develop this site making avoidance of onsite wetland impacts impossible. Based on current market research and comparable sales / listings, it was determined that a use of the site as a single family development is the only feasible way to allow for absorption of the site into the market. …

> The resulting new development plan minimized the wetland impact to the smallest impact possible while allowing the current owner to recoup the losses that were previously incurred, which still represents a substantial financial risk. However, without approval for the development the owner would de facto be incurring a total loss on this investment that now inadvertently turned into a lengthy and tedious development process. Due to the length of the permitting and approval process the current owner continues to incur additional expenses and loss of interest on the outstanding capital that continue to increase the financial damages. …

> However, since avoidance of the impact is not practicable, it was the owner's intention to minimize the impact as far as feasible while also mitigating any damages through the approved mitigation bank/mangrove credits for any losses to the habitat.

JX 79 at 15-16.

Recognizing that mitigation credits purchased from a mitigation bank[7] can be used to offset mangrove wetland impact by providing new or improved habitat for the affected wildlife, Lemon

---

[7]     A mitigation bank is "a site where wetlands and/or other aquatic resources are restored, created, enhanced, or in exceptional circumstances, preserved expressly for the purpose of providing compensatory mitigation in advance of authorized impacts to similar resources."  40 C.F.R. § 230.93 (2021).

Bay acquired credits in the Little Pine Island Mitigation Bank and proposed additional mitigation via conveyance of a three-acre portion of the property to the State of Florida.  Tr. 1780.

It is not typical for the Corps to consider property that is not available for purchase in an alternatives analysis because the purpose of the analysis is to identify other sites that could be used for the proposed project.  Tr. 1035.  Mr. McElwain elaborated, "the site has to be available or potentially capable of being used after taking into consideration cost, existing technology, and logistics in light of the overall purpose."  Id.  For minimization, after the Corps identifies higher quality wetlands on the site and asks the developer to avoid those wetlands to the extent practicable, the developer typically works with the Corps and "go[es] through iterations of site plans where there's minimization involved."  Tr. 1032.  In response to the Corps' request for minimization, however, Lemon Bay did not propose any iterations to its site plan.  Instead, Lemon Bay said that because Mr. LeFave had received approval for a 39-unit development in 2007, and Lemon Bay's proposed development was only 12 units, it had already minimized impacts to the wetlands and no further minimization was required.  See JX 79 at 24.

Finally, Lemon Bay did not address comments from EPA and the NMFS submitted in response to the Corps' May 3, 2012 public notice stating that the project would have substantial and unacceptable adverse impacts on mangroves.  JX 65.  Instead, Lemon Bay argued that the Corps has sole decision-making authority, and that these agencies should retract their comments. See JX 79 at 2-4.

The Corps critiqued various aspects of Lemon Bay's "Practical" Alternatives Narrative, including Lemon Bay's choice of alternative sites.  According to Mr. McElwain, typically when the Corps requests an alternatives analysis, a developer provides an analysis that shows multiple alternative sites and analyzes the presence or absence of wetlands on those sites.  See Tr. 1031-32. The applicant then compares these potential sites with its needs.  Lemon Bay's Alternatives Analysis, however, included two sites that were not available for purchase at the time and one additional property that was for sale for $1.5 million.  JX 79 at 18-23.[8]

On February 14, 2013, Lemon Bay amended its application and proposed a 13-slip dock as part of the development.  JX 82.  As a result of the dock addition, the Corps published another public notice on April 5, 2013, inviting comments on the proposed development with the dock. JX 86.  The public comments in response to the second notice were "virtually the same" as the comments on the first notice.  Tr. 1039; see DX 50.

On May 13, 2013, the Corps informed Lemon Bay that the dock would negatively impact the West Indian manatee and was inconsistent with the Endangered Species Act – a situation known as a "take likely."  JX 91; Tr. 1044-45.  According to Mr. McElwain, the Corps cannot

---

[8]     In response to the Corps' request for Lemon Bay to assess practicable site alternatives, Lemon Bay hired Market America Realty to "conduct a thorough search in Charlotte County for property on the market that would allow [Lemon Bay] to build 12 single family homes on the water."  JX 79 at 16.  Market America Realty, however, only found three potential alternative sites, two of which had already been sold.  Id.

approve a Section 404 permit if there is a "take likely" situation because in order to receive a permit, the project must be in compliance with all federal legislation.  Tr. 1047-48.

On May 28, 2013, the NMFS informed the Corps that it had conducted a benthic survey of the area proposed for dock construction to "evaluate the presence and abundance and overall ecological health of the SAV [submerged aquatic vegetation] at the project site," which "provides very high-quality habitat for many commercially and recreationally important fish and invertebrate species."  JX 92; Tr. 1298, 1300.  Based on the survey, the NMFS determined that the dock project as proposed would have resulted in adverse impacts to essential fish habitat and recommended that the Corps not authorize it.  Tr. 1301.  In response to the concerns about the West Indian manatee and essential fish habitat that arose because of the dock construction, Lemon Bay amended its application to have the proposed dock include only nine slips.  JX 93; Tr. 310-11.

In a letter dated January 3, 2014, the Corps revised the Project Purpose from "residential development in Charlotte County" to "[r]esidential development in coastal southwest Florida with water access to Lemon Bay" given Lemon Bay's request that the Corps evaluate the project with the addition of boat slips.  JX 96 at 2.  The Corps provided a list of outstanding issues for Lemon Bay to address and again asked Lemon Bay to show why it could not minimize its development's impact by shrinking the footprint or reducing the number of units proposed.  JX 96 at 13-14; Tr. 170-71.  In addition, the Corps asked Lemon Bay to respond to the FWS' concern about the project's "take of the manatee."  JX 96 at 16.  Although Lemon Bay had asserted that it could not acquire any other similar waterfront property due to cost, the Corps responded that it "looks at costs from a neutral industry-wide perspective and not an economic perspective to ensure an individual applicant's rate of return."  JX 96 at 9.

Regarding minimization, the Corps informed Lemon Bay:

In order to determine that Lemon Bay Cove LLC has minimized impacts to aquatic resources to the maximum extent practicable, Lemon Bay Cove LLC must clearly demonstrate that alternatives that do not discharge into special aquatic sites are either not practicable or not available.

\*\*\*

The Corps has identified several features of the proposed project that could be minimized in order to reduce impacts to aquatic resources. *Please clearly demonstrate why it is not practicable to minimize the following site features. Please include the acreage of wetland impacts that could be minimized in your evaluation.*

1. *Please clearly demonstrate why it is not practicable to minimize the number of residential units.*
2. *Please clearly demonstrate why it is not practicable to reduce the lot sizes.*
3. *Please clearly demonstrate why it is not practicable to minimize the number of docks.*
4. *Please clearly demonstrate why it is not practicable to minimize the vessel size to a kayak, canoe, and non-motorized vessel or a motorized shallow-draft vessel.*

11

5. *Please clearly demonstrate why it is not practicable to construct the houses on pilings and reduce the acreage of wetland fill. Please include if any fill is needed for any construction activities such as septic or utility lines.*

6. *Please clearly demonstrate why it is not practicable to minimize the project design to eliminate the residential homes and construct parking spaces adjacent to the roadway and docks with an elevated walkway from the parking spaces to the docks.*

JX 96 at 13-14 (emphasis in original).

On May 3, 2014, Lemon Bay responded to the Corps' request that it demonstrate why it could not minimize its development's impacts. JX 98. Although the Corps advised Lemon Bay that it did not agree with the basis of its proposed evaluation criteria, Lemon Bay did not revise its evaluation criteria. Compare JX 98 at 3 with JX 79 at 16. Lemon Bay wrote that

[u]nfortunately, there is nothing on the market that will meet all the criteria requirements. Neither of the considered alternatives possess equal frontage or views. Roadway access and deep water access are also limited. Lastly, viability of these sites for residential development would be further reduced due to the current condition and use of the surrounding properties of the alternate sites that are not consistent with the intended use of the subject site, which would result in a significantly reduced value of the finished product, thus rendering the project infeasible.

JX 98 at 3. Lemon Bay replaced two of the three alternative sites but did not provide upland acreage or impacted or non-impacted wetland acreage. JX 98 at 4. In its avoidance narrative, Lemon Bay noted that utilizing the existing site was the most cost-effective for the owner and the Corps because either of the new alternative sites would require an additional $3.8 million or $1.65 million investment. JX 98 at 6.

With respect to the Corps' concerns with its minimization narrative, Lemon Bay reiterated that it "had demonstrated" "why it [was] not practicable to minimize ANY FURTHER the number of residential units" because its "new proposal" represented a 69% reduction in residential units and a 26% reduction in wetland impacts compared to the original plan for a 39-unit development submitted by Mr. LeFave. JX 98 at 10.

On May 28, 2014, the Corps conducted another site visit to Lemon Bay's property to assess the quality and conditions of the mangrove wetlands and quantify their functions. DX 60; Tr. 1071-72. The Corps determined that the property received regular tidal interchange and that the mangrove wetlands were high-quality wetlands and an essential fish habitat and aquatic resource of national importance. Tr. 1074; JX 108; see DX 60.

On January 16, 2015, the Corps told Lemon Bay that it did not provide enough information to demonstrate that the proposed project was the least environmentally damaging practicable alternative and that, based on the information provided, it was unlikely that the Corps would recommend a positive permit determination. JX 101 at 2. In response, Lemon Bay reiterated that "none of lesser environmentally damaging alternatives available in the marketplace having the

same project purpose would be economically practical." JX 104 at 1. Lemon Bay acknowledged that "while there are less environmentally damaging alternatives in the market place, they are too costly." JX 104 at 1. Lemon Bay submitted an updated market research report prepared by Market America Realty, which stated that according to Lemon Bay's own assessment, the proposed site was the least environmentally damaging practicable alternative and the only economically practical option given Lemon Bay's already expended costs. See JX 104 at 1-3. The updated Market America Realty report included the following "Development Exit Scenario" concluding that "[d]evelopment is only financially feasible at 12 sellable units, to avoid potential losses due to cost overruns in development phase" and stating:

**Development Exit Scenario**

| Units | 1 | 2 | 4 | 6 | 8 | 10 | 12 |
|---|---|---|---|---|---|---|---|
| total revenue | $ 858,635.00 | $ 1,717,270.00 | $ 3,434,540.00 | $ 5,151,810.00 | $ 6,869,080.00 | $ 8,586,350.00 | $ 10,303,620.00 |
| Lot + Infrastructire cost | $ 3,603,618.70 | $ 3,603,618.70 | $ 3,603,618.70 | $ 3,603,618.70 | $ 3,603,618.70 | $ 3,603,618.70 | $ 3,603,618.70 |
| Cost to build | $ 422,937.50 | $ 845,875.00 | $ 1,691,750.00 | $ 2,537,625.00 | $ 3,383,500.00 | $ 4,229,375.00 | $ 5,075,250.00 |
| Total cost | $ 4,026,556.20 | $ 4,449,493.70 | $ 5,295,368.70 | $ 6,141,243.70 | $ 6,987,118.70 | $ 7,832,993.70 | $ 8,678,868.70 |
| Balance | $ (3,167,921.20) | $ (2,732,223.70) | $ (1,860,828.70) | $ (989,433.70) | $ (118,038.70) | $ 753,356.30 | $ 1,624,751.30 |
| % profit | -79% | -61% | -35% | -16% | -2% | 10% | 19% |
| Lot Value - as is (cost + lost profit) | | | | | | | $ 3,428,370.00 |
| Summary: | Development is only financially feasible at 12 sellable units, to avoid potential losses due to cost overruns in development phase | | | | | | |

JX 104 at 12.

On February 1, 2016, the Corps denied Lemon Bay's permit application with prejudice having determined that after "carefully consider[ing] all information provided subsequent to the initial submittal of the application," "the proposed project [did] not comply with the Section 404(b)(1) Guidelines and [was] contrary to the public interest." JX 107 at 1. The Corps emphasized that Lemon Bay did not demonstrate that its project was the least environmentally damaging practicable alternative. JX 108 at 76. Lemon Bay filed an administrative appeal on March 29, 2016, and on December 19, 2016, the Corps denied that appeal. JX 109; JX 111. In the instant action, Plaintiff seeks just compensation in the amount of $3,800,000 based upon its experts' valuation of the property but for the denial of the Corps' permit.

## Discussion

## Legal Standards: Categorical and Regulatory Takings

The Fifth Amendment to the United States Constitution provides that private property shall not be taken for public use without just compensation. U.S. Const. amend. V. "[A] taking can be accomplished by a physical invasion of the property or by the imposition of a governmental regulation." Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1365 (Fed. Cir. 2004). As Justice Holmes characterized the general rule a century ago, "while property may be regulated to a certain extent, if the regulation goes too far, it will be recognized as a taking." Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). In Lucas v. South Carolina Coastal Council, the Court

explained that there could be a taking "where [a] regulation denied all economically beneficial or productive use of the land."  505 U.S. 1003, 1015 (1992).

More recently, in Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency, the Court clarified that its Lucas rule on categorical takings was limited to the "extraordinary circumstance where no productive or economically beneficial use of land is permitted."  535 U.S. 302, 330 (2002) (emphasis in original).  The Tahoe-Sierra Court characterized a Lucas categorical taking as a "'permanent obliteration of value' of a fee simple estate."  Id.  For "[a]nything less than a 'complete elimination of value,' or a 'total loss,'" the Court articulated a different analytical framework "that would require the kind of analysis applied in Penn Central."  Id. (citing Lucas, 505 U.S. at 1019-20, n.8).

Under Penn Central, courts use a three-factor analysis to assess claimed regulatory takings: (1) the character of the governmental action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct investment-backed expectations.  Penn Cent. Transp. Co. v. City of New York, 438 U.S. at 124 (1978); Cienega Gardens v. United States, 331 F.3d 1319, 1337 (Fed. Cir. 2003). When an individual alleges a taking by government regulation, the court must conduct an ad hoc, factual inquiry to determine whether the particular circumstances in the case give rise to a regulatory taking.  Penn Central, 438 U.S. at 124.

If a "categorical" taking has occurred under Lucas, this ends the taking inquiry, and no Penn Central factual analysis need be performed.  Thus, the Federal Circuit has instructed that "it is often important to determine at the outset whether a particular claimed taking was 'categorical' or not."  Rith Energy, Inc. v. United States, 247 F.3d 1355, 1362 (Fed. Cir. 2001) (on rehearing).

## Was There a Categorical Taking of Lemon Bay's Property?

In order to effect a compensable categorical taking under Lucas, a regulation must deny all economically beneficial or productive use of the land such that "the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle."  Lucas, 505 U.S. at 1019 (emphasis in original). Lost Tree Village Corp. v. United States (Lost Tree III), 115 Fed. Cl. 219, 228 (2014) (citing Tahoe-Sierra, 535 U.S. at 330).

Plaintiff argues that the Corps' denial of a permit to fill 2.08 acres of wetlands deprived Lemon Bay of any economically beneficial use of the property, based on the difference in value of its parcel as developed with a Corps permit and undeveloped without it.  In so arguing, Lemon Bay relies on the opinion of its appraiser, Linwood Gilbert.[9]  PX 14B at 8; PX 53; Tr. 825.

---

[9]     This Court admitted Mr. Gilbert as an expert in the fields of real estate appraisal and valuation.  Tr. 769.

In valuing the Lemon Bay property, Mr. Gilbert relied on the expert opinion of Dr. David Depew[10] regarding the permitting process and other cost factors and that of Dr. Henry Fishkind[11] regarding the maximally productive use of the property.  See PX 14B at 4.  Taking these expert opinions into account, Mr. Gilbert opined that the highest and best use of the Lemon Bay property would be the development of seven single-family lots.[12]  Mr. Gilbert then utilized the subdivision approach[13] because there was a lack of comparable sales in the marketplace and determined how quickly the lots would sell and calculated a net cash flow for each future period.  Tr. 784-87.  Finally, he discounted the net cash flow to present value to determine the current value of the property.  Tr. 820.

Specifically, Mr. Gilbert determined that the seven lots would sell for a total of $6,600,000 ($900,000 per lot with the two lots on the end selling for $1 million and $1.1 million due to better views).  PX 14B at 71.  Mr. Gilbert calculated the site development and improvement costs to be $957,343.  PX 53 at 2; Tr. 811-17.  Mr. Gilbert added professional fees, real estate taxes, interest, and developer's overhead to bring the total development costs to $1,196,505 and rounded that to $1,200,000.  PX 53 at 3.  Thus, he determined the net cash flow to be $4,554,165.  PX 53 at 4.  After discounting to present value using a rate of 8.25%, Mr. Gilbert valued the Lemon Bay property as developed with the permit at $3,793,415 rounded to $3,800,000.  PX 53 at 4-5; Tr. 825.

Mr. Gilbert valued the property as undeveloped at $12,500.  PX 53 at 8.  He opined that since the property "is virtually entirely wetlands," no economically beneficial use or value could exist "without the ability to remove mangroves and fill in a portion of the Property."  PX 14B at 37.  Based on Mr. Gilbert's opinion, Plaintiff argues that the approximate 99.6 percent diminution in value of the property from $3,800,000 to $12,500 constitutes a categorical taking.  In contrast, Defendant contends that the undeveloped property should be valued at $15,200, and that Mr.

---

[10]     The Court admitted Dr. Depew as an expert in the fields of land use planning and regulation, site design, development and permitting, construction cost estimating, and the creation and utilization of Transfer Density Units ("TDUs") in Florida.  Tr. 482.

[11]     The Court admitted Dr. Fishkind as an expert in real estate economics and TDUs.  Tr. 672.

[12]     Highest and best use is "the reasonably probable and legal use of property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value, including those uses to which the property may be readily converted."  United States v. Powelson, 319 U.S. 266, 275 (1943); see Otay Mesa Prop., L.P. v. United States, 779 F.3d 1315, 1329 n.4 (2015).

Despite its insistence during the administrative permit application process that it needed a 12-unit project to avoid financial losses, Plaintiff reduced its requested 12-unit project to seven units for purposes of calculating its damages in this litigation.  See PX 14B; Tr. 437-548 (Depew); Tr. 672-709 (Fishkind); Tr. 759-832 (Gilbert).

[13]     The subdivision approach employs aspects of the three major approaches to valuation: the sales comparison approach, the cost approach, and the income capitalization approach and estimates the value of the residential lots that could be developed on the property and the costs of developing those lots and subtracts the costs from the lot sale value.  Tr. 786-87.

Gilbert inflated the value of the property as developed by overestimating the per-lot value at $900,000 when it should have been $399,000 per lot.  Def.'s Post-Trial Br. at 10-11, 72.

Setting aside the parties' dispute about the valuation of the property in its developed or undeveloped state, there is a more fundamental issue about the nature and scope of the taking that dictates whether the alleged taking can be deemed "categorical."  Defendant argues that Plaintiff has not established a categorical taking that rendered Plaintiff's property totally without value because Plaintiff never attempted to develop its property by proposing a smaller footprint or fewer units to minimize the adverse environmental impacts.  Plaintiff, however, contends that Corps representatives advised Lemon Bay that the Corps would never have granted Lemon Bay any permit to develop this property.  Lemon Bay argues that Tunis McElwain, Chief of the Corps' Jacksonville District and Defendant's Rule 30(b)(6) representative, orally stated that the Corps would deny Lemon Bay any permit to fill the property.  Tr. 187; see Tr. 702.  The evidence of record, however, does not bear out Lemon Bay's contention.

### Plaintiff Has Not Established That the Corps Denied All Potential Development of Plaintiff's Land

Mr. Goertz testified that in 2012, at the first meeting between Lemon Bay and the Corps after Lemon Bay submitted its permit application, Mr. McElwain told Lemon Bay that the Corps would never allow any development on the property.  Tr. 79 ("[I]t was Tunis McElwain, he approached us immediately and said that they [would] never give us a permit to move forward on the property.").  Despite these alleged statements from the Corps as far back as 2012, Mr. Goertz and Lemon Bay continued to engage in the permitting process until 2016, when the permit was ultimately denied.  Tr. 187-89.

Mr. Dinkler, Plaintiff's expert in wetland ecology and permitting, who previously worked for the SWFWMD, testified that "in almost every meeting that [Lemon Bay] had, [it was] instructed that the Fort Myers office didn't approve projects that impacted mangroves."  Tr. 300. He continued, that "if there were any phone or meetings with other agency staff, [Lemon Bay was] told that [it] would be asked questions until [it] went away."  Id.[14]  According to Mr. Dinkler, these statements primarily "came from Tunis McElwain, who at the time was the . . . overall manager for the Fort Myers office" and Susan Waichulis, the Corps' project manager, who made it clear "that it was going to be a very steep hill and almost impossible to climb past."  Tr. 301.

On cross-examination, Mr. Dinkler acknowledged:

Q: COUNSEL FOR DEFENDANT: So . . . Mr. McElwain did not state that the Corps would never let Lemon Bay Cove impact any wetlands on its property.  Is that right?

A: MR. DINKLER:   I did not hear him say that specifically, but he did say that

---

[14]     Mr. Dinkler was both a fact and expert witness for Plaintiff.  As principal of Ecological Services Associates, Mr. Dinkler assisted Lemon Bay in permitting its project in Charlotte County. Tr. 266.  The Court admitted Mr. Dinkler as an expert in wetland ecology and local, state, and federal wetland and submerged lands permitting.  Tr. 265.

they rarely, if ever, permit mangroves out of the Fort Myers office.

Tr. 403.

Mr. McElwain denied telling Lemon Bay representatives that the Corps would never grant Lemon Bay a permit and testified that on 12 occasions between 2008 and 2018, the Corps issued permits for developments with mangrove impacts in the Charlotte Harbor estuary area.  Tr. 983-84; 1086-87.  Specifically, Mr. McElwain testified:

Q: COUNSEL FOR DEFENDANT: And did you tell any representative of Lemon Bay that they could never be approved for any development on the property?

A: MR. MCELWAIN: No, I didn't say that.  I -- when I took this job, I took an oath to uphold the Constitution, and due process is part of that, part of the Constitution, and review of the permit application is due process.  So I -- that's not something I would say."

Tr. 1087.  Mr. McElwain further testified:

Q: Can you tell us how many times the Corps issued permits for mangrove impacts in the Charlotte Harbor estuary area between 2008 and 2018?

A: Twelve times.

Tr. 983-84.

Ian Vincent, Defendant's expert in environmental permitting and environmental land use approval in Southwest Florida, including Charlotte County, testified that he "absolutely did not believe" that "Charlotte County would never allow development of this property" as "there certainly [was] nothing in their comprehensive plan policies that [he] reviewed that absolutely would preclude development."  Tr. 1706.

Plaintiff did not adduce any contemporaneous documentary evidence of the Corps advising Lemon Bay that it would be denied any permit whatsoever, as illustrated by the following exchange:

Q: COUNSEL FOR DEFENDANT:  I'd just like to ask, Mr. Goertz, did you make any notes of the meeting with Mr. McElwain in which you claim that he told you that Lemon Bay would never be permitted to develop the site?

…

A: MR. GOERTZ:     I'm sure I did.

Q:     Okay.  And have those notes been produced to the United States?

A:     Nope.

Q:     Those notes were not produced to the United States in connection with this

17

case?

A:      No, no written -- no written notes.

Q:      But do you have written notes of the meeting at which Mr. McElwain allegedly told you that no permit would be developed?

A:      No, not anymore.

…

Q:      Is there any written record that you have of the statement that Mr. McElwain allegedly made regarding development of the Lemon Bay site?

A:      No, nope, nope.  I think only the witnesses in the room.

Tr. 162-63.

In voluminous correspondence spanning several years, the Corps asked Lemon Bay for further information to demonstrate compliance with the Section 404 Guidelines, but did not reject any and all potential development.  JX 71; JX 96; JX 101; Tr. 187-89.  The Corps repeatedly notified Lemon Bay that its proposed 12-unit project was not the least environmentally damaging practicable alternative and requested that Lemon Bay provide further information on possible avoidance (alternative development sites) and minimization (alternative site plans with a smaller impact to the wetlands) as required by the Section 404 guidelines.

In its October 5, 2012 letter, the Corps cautioned Lemon Bay that it needed to show that practicable alternatives were unavailable and that its proposed onsite fill was the minimum necessary.  JX 71.  Plaintiff, however, chose not to amend its permit application to attempt to meet the Corps' concerns.  JX 79.  Instead, Lemon Bay reiterated that because the previous owner, Mr. LeFave, had received preliminary approval for a 39-unit project from Charlotte County in 2007, and Lemon Bay was proposing only 12 units, the project had already achieved the requisite minimization.  JX 79 at 24.  Lemon Bay stressed that it could not reduce the project any further because the 12-unit project was "the breaking point for an economically viable project," and that it had to "mitigate the financial damage and minimize the losses incurred to date" and develop this site "making avoidance of onsite wetland impacts impossible."  JX 79 at 24.

Although in early 2013, Lemon Bay added a dock in the Lemon Bay Aquatic Preserve to its plans and submitted that it made the project water-dependent, the Corps disagreed that the dock converted the project to water-dependence, and informed Lemon Bay that the 13-slip dock would result in more adverse impacts and a "take" of the West Indian Manatee, which the Endangered Species Act and Marine Mammal Protection Act prohibit.  Tr. 165-67, 1040, 1044-46; Stip. ¶ 97.  Lemon Bay reduced the dock from 13 to nine slips, but the Corps concluded that the nine-slip dock was still "likely to result in [a] take of the manatee."  JX 93; JX 101 at 1.

In correspondence between 2014 and 2015, the Corps provided a list of outstanding issues, asking Lemon Bay to show why its development could not be minimized by shrinking the footprint or reducing the number of units proposed, and to clarify the extent of wetlands onsite.  Tr. 170-71, 1060, 1061-65; JX 96 at 6, 9, 13-14.  But in response, Lemon Bay did not suggest any minimization

of the project footprint or reduction in the number of units, reiterating that the project was already minimized from Mr. LeFave's original project proposal, and that it needed to recoup the loss on LeFave's defaulted loan by developing the property in a financially feasible way -- 12 single-family homes "given Lemon Bay Cove's sunk costs in the land."  JX 103 at 1; see also Tr. 177-80, 1066-67, 1079-80; JX 98; JX 104 at 12.

The Corps' ultimate denial decision was limited to the discrete permit that Lemon Bay had sought -- a permit to fill 2.08 acres of high quality tidal forested mangrove wetlands to construct a 12 single-family unit residential development, not any conceivable potential development of this land.  See JX 108 at 45; JX 111 at 25.  Plaintiff suggests that the Corps' denial of Lemon Bay's application "with prejudice" indicates that the Corps would never approve any permit for Lemon Bay to fill the property.  However, the only application that the Corps denied with prejudice was the application to fill 2.08 acres and construct 12 units.

In sum, in correspondence spanning 2012-2015, the Corps requested avoidance, minimization, and mitigation, but Lemon Bay refused to propose the requested less environmentally damaging development scenarios or alter the parameters of its proposed project for its own financial reasons.  See e.g., JX 71; JX 79; JX 91; JX 93; JX 96; JX 98; JX 101; JX 103. As such, the record as a whole does not support Plaintiff's contention that the Corps advised Lemon Bay that it would never grant any permit no matter what the acreage or number of units. Plaintiff did not prove that the Corps' denial of its permit for a 12-unit project deprived the property of all economic value as required to establish a categorical taking.

**This Case Is Distinguishable from Lost Tree Village**

Plaintiff further argues that this case is essentially identical to Lost Tree Village where the courts determined that the denial of a Corps' permit effected a categorical taking.  Tr. 2201-05. However, the issue in Lost Tree Village was defining the parcel, not the scope and parameters of the requested permit.  In Lost Tree Village, the landowner sought a Section 404 permit to fill a previously platted parcel consisting of mangroves, swamp, and wetlands, Parcel 57, and develop a residential home site, and the court looked to a neighboring plat and scattered wetlands within the community to define the relevant parcel.  Lost Tree Village I, 100 Fed. Cl. at 424-25.  The Court of Federal Claims found no regulatory taking because the denial of the permit for the two plats and scattered wetlands only diminished the value of this parcel by some 58.4%, an insufficient economic loss under Penn Central.  100 Fed. Cl. at 439.  On appeal, the Federal Circuit found that the trial court erred in defining the relevant parcel by aggregating the two parcels and the scattered wetlands, and instructed that when determining whether a categorical taking has occurred, the court must look only to Parcel 57 because Lost Tree Village had treated Parcel 57 as a separate economic unit.  Lost Tree Village v. United States, 707 F.3d 1286, 1294 (Fed. Cir. 2013).  On remand, the trial court found that considering the single plat, the denial of a permit by the Corps caused a diminution in value of 99.4% and amounted to a categorical taking because it denied Lost Tree Village all economically beneficial or productive use of the land in that parcel. Lost Tree Village III, 115 Fed. Cl. at 231; accord Palm Beach Isles Assoc. v. United States, 208 F.3d 1374, 1381 (Fed. Cir. 2000).

There was no suggestion in Lost Tree Village, as there is here, that the denial of the permit was based on a use-specific application that the landowner could have altered to minimize adverse

environmental impacts.  Here, the Corps denied Lemon Bay a permit to fill 2.08 acres and build a 12-unit project, and invited Lemon Bay to amend its permit application to encompass a development of lesser size and impact.  Plaintiff's persistence in limiting its proposed development to a 12-unit footprint for its own financial reasons prevented the Corps' consideration of any other economically viable uses of the property.  Because Plaintiff has failed to establish that the Corps' denial of Plaintiff's Section 404 permit application for a 12-unit development obliterated all value of the property, Plaintiff has not established a categorical taking.  Mehaffy v. United States, 499 F. App'x 18 (Fed. Cir. 2012).

### Defendant's Alternative Ground for Denying a Taking: The Economic Value of Plaintiff's Potential Perfection and Sale of Transfer Density Units

Defendant posits an alternative ground for denying Plaintiff's categorical taking claim submitting that there is an economic use for Lemon Bay's land in the potential perfection and sale of its estimated Transfer Density Units ("TDUs").  The Pacific Legal Foundation's amicus brief explains the Charlotte County TDU program:

> Like similar schemes employed by municipalities across the nation, TDUs utilize market mechanisms to facilitate a more optimal distribution of development rights. Arthur C. Nelson et al., The TDR Handbook: Designing and Implementing Transfer of Development Rights Programs xiv.  In particular, Charlotte County's program "shifts residential density from areas where it is inappropriate . . . to areas where [it is] more appropriate."  Transfer of Density Units (TDU), Charlotte County, Florida Government Portal.  It does so by identifying "sending zones," i.e. areas to be made less dense, and "receiving zones, areas where density is added."  Id.  County zoning ordinances determine the number of residential dwelling units permitted per gross acre of land.  Comprehensive Plan: Future Land Use Appendix III at 6.  Each additional "increment" of permitted housing constitutes a "density unit."  Id. Property owners in sending zones can "sever" unused density units from the land by entering a perpetual covenant to restrict the use thereof.  Charlotte Cty. Muni. Code § 3-9-150(b), (f).  This creates "density credits" which can then be sold to property owners in receiving zones.  Charlotte Cty. Muni. Code § 3-9-150(b).  For the receiving property owners, these credits operate as exemptions from otherwise applicable density limits.

ECF No. 98-1 (Br. Amicus Curiae of Pacific Legal Foundation) at 4-5.

Plaintiff vigorously disputes that the potential perfection and sale of its estimated TDUs to third parties represents an "economic use" for purposes of a taking because the perfection of TDUs requires the property to remain in its natural undeveloped state.  According to Plaintiff, selling TDUs would yield income to a landowner, not from cultivating or developing its property in the traditional framework of property ownership but from a regulatory construct -- a devised market -- which requires that the owner's land be kept vacant and idle in order to allow someone else's land to be developed in its stead.  For this swap in development rights, the owner would receive a monetary payment based on the nonuse of its property.  Defendant, on the other hand, ascribes a valuation of between $504,000 and $630,000 to Plaintiff's potentially marketable TDUs, which it claims establishes an economic value for Plaintiff's property in its undeveloped state.

20

The parties dispute whether the potential perfection and sale of Plaintiff's TDUs can be considered in determining whether a taking has occurred. In debating the propriety of considering TDUs in the taking context, the parties attribute different interpretations to the existing caselaw -- a dispute which raises a thorny legal issue.[15] In the instant case, the record is insufficient for this Court to resolve the threshold factual issue of whether the potential perfection and sale of Plaintiff's estimated TDUs had economic value, and, if so, what that value was.[16] Thus, the Court does not reach Defendant's alternative ground for challenging Plaintiff's categorical taking claim.[17] In any event, reaching this issue is unnecessary here given the Court's conclusion that Plaintiff failed to establish that the Corps' permit denial deprived Lemon Bay of all economic use of its property. If Defendant had prevailed on its alternative argument, it would merely have

---

[15]     Plaintiff and the amici rely on Justice Scalia's concurrence in <u>Suitum v. Tahoe Regional Planning Agency</u>, 520 U.S. 725, 747 (1997) (Scalia, J., concurring in part and concurring in the judgment, O'Connor, J. and Thomas, J. joining) ("TDRs, of course, have nothing to do with the use or development of the land to which they are (by regulatory decree) 'attached.' The right to use and develop one's own land is quite distinct from the right to confer upon someone else an increased power to use and develop <u>his</u> land. The latter is valuable, to be sure, but it is a <u>new</u> right conferred upon the landowner in exchange for the taking, rather than a <u>reduction</u> of the taking.... Just as a cash payment from the government would not relate to whether the regulation 'goes too far' (<u>i.e.</u>, restricts use of the land so severely as to constitute a taking), but rather to whether there has been adequate compensation for the taking; so also the marketable TDR, a peculiar type of chit which enables a third party … to use his land in ways the government would otherwise not permit, relates not to taking but to compensation.") (emphasis in original).

On the other hand, Defendant focuses on language in <u>Penn Central</u> and cases construing that language.  <u>See</u> <u>Penn Central</u>, 438 U.S. at 137 (stating that "while these rights [TDRs] may well not have constituted 'just compensation' if a 'taking' had occurred, the rights nevertheless undoubtedly mitigate whatever financial burden the law has imposed on appellants and, for that reason, are to be taken into account in considering the impact of regulation"); <u>Deltona Corp. v. United States</u>, 657 F.2d 1184, 1192, n.14, 228 Ct. Cl. 476, 490, n. 14 (1981) (despite the frustration of the plaintiff's reasonable investment-backed expectation by the statutes and regulations at issue, plaintiff's "residual economic position [was] very great" in part because it possessed TDRs, which "mitigate whatever financial burdens the law imposes"); <u>Good v. United States</u>, 39 Fed. Cl. 81, 108 (1997), <u>aff'd</u>, 189 F.3d 1355 (Fed. Cir. 1999) (stating that "the concurring opinion in <u>Suitum</u> underscores the Court's reaffirmation of the <u>Penn Central</u> holding that the value of TDRs is to be considered to answer the threshold question of whether a taking has occurred.").

[16]     The Court finds the opinion and testimony of Defendant's expert on the estimated valuation of the potential perfection and sale of Plaintiff's TDUs to be unpersuasive.  <u>See</u> Tr. 1319-1512; DX 72; JX 141.  Defendant failed to establish a sufficient factual predicate or indicia of the reliability of the expert's pricing of individual TDU transactions that were the basis for his valuation opinion.  <u>See</u> Tr. at 1424-45, 1447-49, 1466-73, 1479-81; DX 72 at 2, 14; JX 141.

[17]     The Court also cannot determine on this record whether the perfection and sale of Plaintiff's estimated TDUs have economic value in the context of assessing the <u>Penn Central</u> factors.

bolstered this conclusion by demonstrating that the property could potentially have retained beneficial economic value by generating marketable TDUs.

**Regulatory Taking of Lemon Bay's Property under Penn Central**

Alternatively, Plaintiff alleges a regulatory taking of its property under Penn Central Transportation Company v. City of New York, 438 U.S. 104 (1978). In the context of a Penn Central analysis, whether a given regulation goes "too far" in imposing a burden on a landowner and warranting compensation under the Fifth Amendment is determined by an "ad hoc, factual inquiry." Cienega Gardens, 331 F.3d at 1337 (citing Penn Central, 438 U.S. at 124). The Penn Central three-factor analysis considers (1) the extent to which the regulation interfered with distinct investment-backed expectations, (2) the character of the governmental action, and (3) the economic impact of the regulation on the claimant. Id. Using this factual inquiry, this Court must determine whether the Corps' denial of a permit to Lemon Bay to fill its property constitutes a taking that requires just compensation.

**Reasonable Investment-Backed Expectations**

Lemon Bay claims that it invested $891,078.02 in its property, representing its member I.H.T.'s loss on the defaulted loan, plus $400,000 that Lemon Bay expended "in attempting to permit the property." Pl.'s Post-Trial Br. at 34. Defendant argues that Plaintiff's reasonable investment-backed expectations equate to either the $10 Lemon Bay paid to I.H.T. for the property in 2011, or I.H.T's $15,200 payment at the foreclosure sale in 2010.

"[T]o support a claim for a regulatory taking, an investment-backed expectation must be 'reasonable.'" Cienega Gardens, 331 F.3d at 1346 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984)). The test for whether investment-backed expectations are reasonable is an objective one. Cienega Gardens, 331 F.3d at 1346. "The subjective expectations of the [plaintiff] are irrelevant. The critical question is what a reasonable owner in [plaintiff's] position should have anticipated." Chancellor Manor v. United States, 331 F.3d 891, 904 (Fed. Cir. 2003). "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." Ruckelshaus, 467 U.S. at 1005. "[T]he timing of the purchase and knowledge of the purchaser are relevant considerations in determining whether a purchaser had reasonable investment-backed expectations with which the government's regulatory action interfered." Anaheim Gardens, LP v. United States, 953 F.3d 1344, 1350 (Fed. Cir. 2020) (citations omitted).

"In the context of the Penn Central balancing test, the complete absence of reasonable distinct investment-backed expectations can weigh sufficiently heavily as to be dispositive of a takings claim." Id. at 1351 (citing Ruckelshaus, 467 U.S. at 1005). A property owner who acquires land with knowledge of a regulatory restraint "could be said to have no reliance interest or to have assumed the risk of any economic loss." Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1179 (Fed. Cir. 1994); Creppel v. United States, 41 F.3d 627, 632 (Fed. Cir. 1994).

Here, as Plaintiff was aware, the Corps' requirement that it obtain a Section 404 permit was a longstanding regulatory restraint that impacted potential development of its property. In 2008, when I.H.T. made the loan to Mr. LeFave secured by the property, and in 2011, when I.H.T. both acquired the property at the tax sale then sold the property to Lemon Bay, this requirement

was in place.  When I.H.T. acquired the property, Plaintiff's members were aware that it would not be easy to obtain permits.  Tr. 125 ("Yes, we were aware, not at each level, but we were aware about the red flags that Mr. LeFave had to work on.").  As the Federal Circuit recognized in Anaheim Gardens, "it is particularly difficult to establish a reasonable investment-backed expectation" if the property was acquired after the alleged regulatory restriction. 953 F.3d at 1350 (quoting Norman v. United States, 429 F.3d 1081, 1092-93 (Fed. Cir. 2005)).

Plaintiff argues that takings claims are "not barred by the mere fact that . . . title was acquired after the effective date of the state-imposed restriction."  Lost Tree Village I, 100 Fed. Cl. 412, 437-38 (2011) (citing Palazzolo, 533 U.S. at 633) (internal citations omitted), rev'd on other grounds, 707 F.3d 1286 (Fed. Cir. 2013).  Under the Section 404 regulatory regime, however, an applicant's knowledge of the Clean Water Act's restrictions and the need to obtain regulatory approval to fill wetlands, can be a significant factor preventing a finding of reasonable investment-backed expectations.  See Norman v. United States, 429 F.3d at 1093 (finding no reasonable investment-backed expectation because plaintiff knew of the wetland restrictions and acquired the property "with full knowledge that portions of it were not subject to development"); Good, 189 F.3d at 1361-62 (recognizing that "[i]n view of the regulatory climate that existed when appellant acquired the property, he could not have had a reasonable expectation that he would receive approval to fill ten acres of wetlands in order to develop the land.").  "To hold otherwise would turn the Government into an involuntary guarantor of the property owner's gamble that he could develop the land as he wished despite the existing regulatory structure." Mehaffy v. United States, 102 Fed. Cl. 755, 765 (2012), aff'd, 499 F. App'x 18 (Fed. Cir. 2012) (quoting Forest Props., Inc. v. United States, 39 Fed. Cl. 56, 76-77 (1997)).  In Mehaffy, the court found that the plaintiff had both constructive and actual knowledge that federal regulations could ultimately prevent him from developing his land, and "did not have a reasonable, investment-backed expectation that he could develop the property without being subject to the permitting requirements of the [Clean Water Act]." Mehaffy v. United States, 499 F. App'x at 22.  Here, as in Mehaffy, Plaintiff did not prove that it had a reasonable investment-backed expectation in developing its wetland property without being subject to the regulatory permitting requirements.[18]

**Character of the Governmental Action**

In determining the character of the governmental action, a reviewing court must consider the purpose and importance of the public interest reflected in the regulatory imposition.   Under the Clean Water Act, the Government is required to protect and prevent damage to the waters of the United States, including the type of wetlands on Plaintiff's property.  It is undisputed that

---

[18]   In addition to its knowledge of the regulatory hurdles undercutting its reasonable investment-backed expectations, Plaintiff did not establish that its reliance on a single appraisal that I.H.T. received in 2007, valuing the property as developed at $4,470,000, created a reasonable expectation of the value of the property within the meaning of Penn Central.  PX 12 at 23.  This appraisal was subject to the owner receiving requisite permits, the preparer of the appraisal did not testify at trial, and the appraisal itself was not admitted as evidence of the truth of its contents, but only for the limited purpose of demonstrating that I.H.T. relied on it in making the loan.  Tr. 62-64; PX 12 at 4, n.1.  There is no evidence establishing the bona fides of the appraisal, and Plaintiff has not established that the appraisal's valuation of the property was accurate, or that I.H.T.'s reliance on the appraisal was reasonable.

Plaintiff's property contains Category I wetlands and mangroves. Tr. 135-36. According to Mr. Sramek, a biologist from the NMFS, the property "contains overall high-quality, functioning mangrove wetlands," and there was "very little anthropogenic or human use evidence that the mangroves had been impacted." Tr. at 1289-90. Further, the property was designated as an essential fish habitat and an aquatic resource of national importance. See JX 55.

Courts have consistently held that the Clean Water Act's Section 404 program serves a legitimate public purpose in preventing harm to environmental resources such as wetlands. Mehaffy, 102 Fed. Cl. at 768 (The Corps' section 404 permitting regime "is designed to protect and preserve the nation's wetlands."); Brace v. United States, 72 Fed. Cl. 337, 356 (2006) ("[T]he United States has a legitimate public welfare obligation to preserve our nation's wetlands.").

In assessing the character of the governmental action, "a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint," and determine whether a burden benefitting the public was "placed disproportionally on a few private property owners." Cienega Gardens, 331 F.3d at 1337-38 (citing Loveladies Harbor, 28 F.3d at 1176). A landowner plaintiff will prevail only when the burden on the landowner is "so substantial and unforeseeable" that it must instead be borne by the public. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 14 (1984).

While the governmental action here -- the permit denial -- leaves Plaintiff unable to effect what it considered to be the only profitable development of its property and imposes a burden, Plaintiff has not demonstrated that this burden is "so substantial and unforeseeable" that it must be borne by the public. Kirby Forest, 467 U.S. at 14. In Plaintiff's view, the permit denial created a substantial burden because it prevented it from developing 12 single-family units that it needed to make the site an economically viable project. JX 104 at 12. However, Lemon Bay's economic dilemma stems from its member's pre-existing financial outlay on I.H.T.'s defaulted loan and its resultant inability to minimize the project's impact on wetlands by reducing the number of units or footprint. This burden, caused in part by circumstances of Plaintiff's own making, cannot be deemed so "substantial" in a takings analysis that it must be borne by the public.

Nor was the regulatory landscape requiring Lemon Bay to obtain the Section 404 permit "unforeseeable." The Section 404 Guidelines were in effect decades before Lemon Bay sought its permit and provided that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." Forest Prop., Inc. v. United States, 177 F.3d 1360, 1363 (Fed. Cir. 1999) (quoting 40 C.F.R. § 230.10(a) (1988)). Because of these restrictions on development resulting from the Section 404 permitting regime, as the Federal Circuit explained, "few, if any, dredge or fill permits will be granted for the construction of housing." Id.; see Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1547 (Fed. Cir. 1994); Good v. United States, 189 F.3d 1355, 1359 (Fed. Cir. 1999). As such, the burden that Plaintiff experienced due to the permit denial was foreseeable. In sum, the character of the governmental action weighs in favor of Defendant.

## Economic Impact

This factor requires "that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation" and is "intended to ensure that not every restraint

imposed by the government to adjust the competing demands of private owners [will] result in a takings claim." Cienega Gardens, 331 F.3d at 1340 (citing Loveladies Harbor, 28 F.3d at 1177). "Proving economic loss requires a plaintiff to show what use or value its property would have but for the government action." A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014). Plaintiff argues that its economic loss should be measured by the difference in value of the property without a Section 404 permit, $12,500, a nominal value, and the value of the property with the permit, $3,800,000.

Defendant argues that Plaintiff's valuation of its property but for the denial of the Corps permit hinges on the assumption that the property is readily convertible for residential use, an assumption that is unwarranted because Lemon Bay did not receive all federal, state, and local permits required for developing the property. ECF No. 167 at 46. In addition to the Section 404 permit from the Corps, Lemon Bay needed an ERP from the SWFWMD, the state of Florida water management district, and approval from Charlotte County on compliance with its Comprehensive Plan and land development regulations.

In order to get an ERP, Plaintiff had to show that the project would not be harmful to water resources or violate state water quality standards, and not be contrary to the public interest. See Fla. Stat. Ann. § 373.414(1) (West 2020). According to Hugh Dinkler, an environmental scientist retained by Lemon Bay to obtain the ERP and "future state sovereign lands authorization" for the multi-slip dock, the proposed project met all criteria for an ERP. Tr. 266. On December 20, 2012, Plaintiff had been granted an ERP from the SWFWMD for the project without a dock. JX 77 at 1. Although Plaintiff's experts opined that Lemon Bay would likely have been able to lease land from the state and include a dock, they acknowledged that no federal, state, or local regulatory authority had authorized construction of a dock on the subject property. See Tr. 282-84, 325-26, 552, 842; PX 1 at 10; Stip. ¶¶ 78, 111. Lemon Bay never amended its ERP application to the SWFWMD to reflect the addition of the dock, and Lemon Bay's ERP, without a dock, ultimately expired on January 5, 2018. Based on the record of Plaintiff's dealings with the SWFWMD and the expert testimony, the Court finds that Plaintiff did not demonstrate by a preponderance of the evidence that it would have been able to obtain an ERP from the state of Florida water management district.

Nor has Plaintiff demonstrated that it would have obtained approval of its site plan from Charlotte County. Plaintiff's land use planning and regulation expert, Dr. Depew, opined that because the LeFave site plan had received preliminary approval from Charlotte County, Lemon Bay would have also received such approval. Tr. 523-25. Dr. Depew dismissed the detailed conditions that had to be addressed before final approval, as "nothing out of the ordinary." Tr. 525. He opined that both the LeFave 39-unit site plan and Lemon Bay's seven-unit site plans would have been approved after providing unexplained "engineering details." Tr. 526, 531-33; see also PX 1 (Depew Report).

Defendant's expert in environmental permitting, Ian Vincent,[19] opined that the fact that the LeFave plan received preliminary ERP approval did not increase the likelihood that Charlotte

---

[19]   The Court admitted Mr. Vincent as an expert in the fields of environmental permitting and the environmental components of local land use approvals in Southwest Florida, including Charlotte County. Tr. 1570.

County would approve either the Lemon Bay 12-unit or seven-unit plans. Tr. 1649-50. The Court credits the testimony of Mr. Vincent that Lemon Bay would not have received site plan approval from Charlotte County, based on his review of the Charlotte County Comprehensive Plan's environmental and coastal planning goals, the Manasota and Sandpiper Key Zoning Overlay District regulations, as well as the history of Mr. LeFave's and Lemon Bay's applications to the SWFWMD and the Corps. DX 73 at 17; Tr. 1615-16, 1644-47. Mr. Vincent opined that both Lemon Bay's original 12-unit plan and Dr. Depew's subsequent 7-unit plan were inconsistent with the County's Environmental Policies 3.1.3, 3.1.5, and 3.1.8, Coastal Planning Policies 1.1.2, 1.1.3, 1.1.4, 1.1.5, and 1.1.9, and the no-fill provision of the Manasota and Sandpiper Key Zoning Overlay District. Tr. 1681-1705; see also JX 44. These policies provide for the limitation of impacts on Category I wetlands where no feasible and practicable alternative exists that will permit a reasonable use of the land. See Tr. 1671. Mr. Vincent testified that the county would require a wetland avoidance and minimization discussion, and that Lemon Bay had made "no effort…to justify why a development footprint of two acres of…Category I wetland impact was necessary." Tr. 1672-73; see also Tr. 1687-88, 1691-92, 1696, 1735.

According to Mr. Vincent, Lemon Bay's plan was inconsistent with Coastal Planning Policies because it "propose[d] the removal of approximately two acres of mangroves, along with the construction of a dock in an aquatic preserve," which would "adversely impact the environmental integrity of natural resources" and because Lemon Bay's proposed development was habitat for some of the protected species of flora and fauna, such as the smalltooth sawfish. Tr. 1693, 1697.

The Manasota and Sandpiper Key Zoning Overlay District provides that Sandpiper Key is "a no-fill area within which only pilings and stem walls may be used for all construction, except the minimum amount of fill necessary within the building footprint and for drainfields associated with onsite water treatment and disposal systems." Tr. 1698-99. According to Mr. Vincent, Lemon Bay's plan was inconsistent with this no-fill provision because the proposed fill extended "well beyond the building footprint and associated drainfields." Tr. 1699.

Mr. Vincent opined that the preliminary approval of the LeFave site plan did not mean that the Lemon Bay site plan would have been approved, pointing out that the LeFave plan had been approved using the 1997 version of the Comprehensive Plan which had less onerous requirements for approval than the applicable 2005 version. Tr. 1646-49. Ms. Jaime Scudera, an environmental specialist for Charlotte County in the zoning division who reviewed development applications testified that the preliminary site plan approval is "incredibly easy" to obtain and is essentially just a mechanism to obtain a list of conditions that need to be met in order to obtain final approval. Tr. 1235, 1241, 1245-48. Based on Mr. Vincent's and Ms. Scudera's persuasive testimony, the Court finds that Lemon Bay has not demonstrated that it would have been able to obtain final site plan approval from Charlotte County.

While it is obvious that Plaintiff's property would be far more valuable if it were a residential development rather than unspoiled wetlands, Plaintiff has not established financial loss attributable to the Corps' denial of its permit application, given its failure to prove that it would have obtained the necessary ERP from the SWFWMD and site plan approval from Charlotte County. Thus, the economic impact factor weighs in favor of the Government.

**Statutory Right to Bulkhead and Fill Under Florida Law**

Lemon Bay alleges that the Corps' denial of its Section 404 wetland permit application amounts to a taking of its statutory right to bulkhead and fill its property under Florida law because the right to bulkhead and fill submerged wetlands is a property right that is appurtenant to and runs with its title to the property.  Even assuming that Plaintiff does have a statutory right to bulkhead and fill its property under Florida law and that that right runs with its title to the property, this does not resuscitate Plaintiff's failed takings claim or operate to confer a separate basis for takings liability. As the Government points out, Plaintiff's state-law conferred entitlement to bulkhead and fill cannot be segregated from its bundle of rights associated with ownership of property for a takings analysis.  "Taking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." Penn Central, 438 U.S. at 130.

Even if Plaintiff demonstrated a vested right under state law to bulkhead and fill its property, a restriction of that right via the denial of a federal permit to fill wetlands would not be determinative of a federal taking claim.  Good v. United States, 39 Fed. Cl. 81, 98 (1997), aff'd, 189 F.3d 1355 (Fed. Cir. 1999) ("[E]ven if plaintiff were able to demonstrate the existence of such a vested right under state law, a federal restriction on that state right would not demonstrate the federal restriction to be a taking." (citing Corn v. City of Lauderdale Lakes, 95 F.3d 1066, 1073 (11th Cir. 1996) (denial of permission to build project to which developer holds vested right does not by itself establish takings liability)).

## Conclusion

Plaintiff has failed to demonstrate either a Lucas categorical taking or a Penn Central regulatory taking.  The Clerk is directed to enter final judgment in favor of Defendant.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**